IN THE UNITED STATES BANKRUPTCY COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
DURHAM DIVISION

| | |
|---|---|
| IN RE: ) | |
| ) | |
| SOUTHERN SEASON, INC. ) | |
| ) | Case No: 16-80558 |
| Debtor. ) | |
| ) | Chapter 11 |
| ) | |

**MOTION TO (A) APPROVE SALE OF SUBSTANTIALLY ALL ASSETS, (B) ESTABLISH RELATED SALE PROCEDURES, (C) TRANSFER ANY AND ALL CLAIMS, LIENS, ENCUMBRANCES AND INTERESTS IN SALE ASSETS TO PROCEEDS OF SALE, (D) APPROVE FORM AND MANNER OF NOTICE OF SALE, (E) ASSUME AND ASSIGN CERTAIN REAL PROPERTY LEASES, AND (F) SCHEDULE HEARINGS**

NOW COMES Southern Season, Inc. (the "Debtor"), pursuant to §§ 105 and 363 of the Bankruptcy Code and Bankruptcy Rules 2002, 6004 and 9006, and hereby moves the Court as follows:

1. On June 24, 2016 (the "Petition Date"), the Debtor filed a voluntary petition seeking relief under Chapter 11 of the Bankruptcy Code. The Debtor continues in possession of its assets as debtor-in-possession. On July 8, 2016, an Official Committee of Unsecured Creditors (the "Committee") was appointed.

2. The Court has jurisdiction over the subject matter hereof pursuant to 28 U.S.C. §§151, 157 and 1334 and Local Rule 83.11 adopted by the United States District Court for the Middle District of North Carolina, and this is a core proceeding within 28 U.S.C. §157(b)(2). Venue is proper pursuant to 28 U.S.C. §§1408 and 1409.

3. The Debtor was founded in 1975 and is a premier retail destination for specialty food and gifts. The Debtor currently operates its flagship retail store located in Chapel Hill, North Carolina, and its three "Taste of Southern Season" stores in Asheville, and Raleigh, North

Carolina and Charleston, South Carolina.

4.     On or about August 8, 2016, John Fioretti of ABTV was appointed as the Debtor's Chief Restructuring Officer (the "**CRO**").  The CRO has the full and complete authority to manage the affairs of the Debtor. The CRO is currently evaluating the Debtor's business and affairs in order to determine whether to pursue reorganization, a sale process or alternative outcome for this chapter 11 case.

## Background and Security Interests

5.     Pre-petition, on or about June 27, 2014, the Debtor and CertusBank, N.A., entered into a certain Amended and Restated Loan and Security Agreement (the "Loan Agreement"), amending and replacing that certain Loan and Security Agreement dated September 4, 2013, pursuant to which CertusBank agreed to issue one or more letters of credit for the account of the Debtor and it subsidiaries, in an amount not to exceed $750,000, and made a revolver loan in an amount of up to $5,000,000, with the total combined amount of letters of credit and advances under the revolver loan not to exceed $5,000,000.  Under the Loan Agreement, CertusBank, N.A., was granted a security interest in substantially all of the Debtor's assets, including but not limited to its inventory, accounts receivable, equipment and other tangible personal property, and deposit accounts.  CertusBank filed a UCC Financing Statement with the North Carolina Secretary of State on August 30, 2013, File No. 20130083814A, identifying its collateral to include all of the Debtor's personal property.

6.     On September 24, 2015, CertusBank, N.A. assigned the Loan Agreement, together with all related documents, to SummitBridge National Investments IV, LLC ("SummitBridge"). SummitBridge filed a UCC Financing Statement with the North Carolina

Secretary of State on October 12, 2015, File No. 20150097227G, identifying that the Loan Agreement had been assigned to SummitBridge.

7. On April 15, 2016, the Debtor, its affiliates, and SummitBridge entered into a certain Forbearance Agreement pursuant to which, *inter alia*, the Debtor acknowledged that the total outstanding indebtedness under the Loan Agreement was $4,496,742.61, consisting of principal of $4,450,000, and accrued interest of $46,742.61, as of April 1, 2016.

8. SummitBridge asserts a first priority security interest in the Debtor's accounts receivable and inventory, as well as a first priority security interest in the Debtor's equipment, and other tangible and intangible assets. The amount outstanding on the SummitBridge indebtedness as of the Petition Date is approximately $4,450,000.00.

9. Under the Forbearance Agreement, the Debtor is required to maintain certain minimum amounts of inventory, calculated based upon the lower of market value and cost, during as of the end of each month, as follows:

| Date | Inventory Minimum |
|---|---|
| June 30, 2016 | $3,000,000 |
| July 31, 2016 | $3,000,000 |
| August 31, 2016 | $3,000,000 |
| September 30, 2016 | $3,000,000 |
| October 31, 2016 | $4,000,000 |
| November 30, 2016 | $5,000,000 |
| December 31, 2016 | $3,500,000 |
| January 30, 2017 | $3,000,000 |

10. As of the Petition Date, the Debtor had inventory totaling approximately $3,528,693.22, calculated on a cost basis.

11. On February 24, 2015, U.S. Foods, Inc. filed a UCC Financing Statement with the North Carolina Secretary of State, File No. 20150016195A, which asserted a security interest in

3

all of the Debtor's personal property. However, as of the Petition Date, the Debtor does not have any indebtedness to U.S. Foods, Inc.

12. On June 7, 2016, Sysco Raleigh, LLC filed a UCC Financing Statement with the North Carolina Secretary of State, File No. 20160057908K, which asserted a security interest in substantially all of the Debtor's personal property. As of the Petition Date, the Debtor's indebtedness Sysco Raleigh, LLC ("Sysco") totaled approximately $142,700. However, since its UCC Financing Statement was filed within ninety (90) days prior to the Petition Date, the perfection of its security interest is avoidable under 11 U.S.C. § 547. *See, e.g., Ward v. Bank of Granite (In re Hickory Printing Grp., Inc.),* 479 B.R. 388, 404 (Bankr. W.D.N.C. 2012) (the perfection of a security interest by filing a UCC Financing Statement during the 90-day preference period is subject to avoidance under 11 U.S.C. § 547).

13. Except for the lien of Silk Route Capital Corporation, LLC as discussed below, the Debtor does not believe that any other creditors have or assert liens upon or security interests in the Debtor's assets.

14. On July 14, 2016, this Court entered an Interim Order Granting Authority to Obtain Post-Petition Financing From Silk Route Capital Corporation, LLC ("Existing DIP Lender"), which granted interim authority for the Debtor to Borrow up to $750,000 (Docket No. 78), pending a final hearing (the "First Interim DIP Financing Order").

15. On August 5, 2016, this Court entered a Second Interim Order Granting Authority to Obtain Post-Petition Financing From Silk Route Capital Corporation, which granted interim authority for the Debtor to Borrow up to $1,400,000 (Docket No. 121), pending a final hearing (the "Second Interim DIP Financing Order", together with the First Interim DIP Financing Order, collectively, the "Existing Interim DIP Financing Orders").

16. Pursuant to the Existing Interim DIP Financing Orders, Silk Route Capital Corporation ("Silk Route" or the "Existing DIP Lender") was granted a lien and security interest in all of the Debtor's assets provided that such liens and security interests do not extend to Avoidance Actions (as defined in the Existing Interim DIP Financing Orders) and are subordinated to allowed PACA trust claims, the lien of Summit Bridge National Investments, IV, LLC and Permitted Trailing Expenses.

17. Prior to July 26, 2016, the Existing DIP Lender had advanced $250,000 to the Debtor. On July 26, 2016, after a further hearing on the use of cash collateral and post-petition financing with the Existing DIP Lender had been conducted, the Debtor sent a draw request to the Existing DIP Lender, requesting that it advance $400,000 under the Post-Petition Credit Agreement. Pursuant to Section 1.2 of the Post-Petition Credit Agreement, Silk Route was obligated to transfer the proceeds to the Debtor within three (3) Business days of the draw request. Silk Route disbursed only $122,000 to the Debtor by July 29, 2016.

18. On the morning of August 2, 2016, one business day after Silk Route failed to timely disburse the funds requested under the draw request, the Debtor, through counsel, provided written notice to counsel for Silk Route, SummitBridge, the Unsecured Creditors Committee, and the Bankruptcy Administrator. This notice (i) identified the failure of Silk Route to timely disburse the funds under the draw request, (ii) requested that Silk Route advance the remaining amount no later than 4 p.m. on August 3, 2016, and (iii) notified the parties that the Debtor was in discussions with potential investment bankers to assist in conducting a sale of substantially all of the Debtor's assets.

19. On August 4, 2016, the Debtor filed a motion to employ Three Twenty-One Capital Partners, LLC ("321 Capital") as its investment banker, primarily to provide services in

connection with marketing and locating the highest and best potential bidders for the Debtor's assets in a going concern sale.  Since the filing of the motion to employ 321 Capital, it has sent teasers out to approximately 200 potential bidders that purchase distressed assets.  321 Capital has also been engaged in meaningful discussions with multiple prospective bidders, and multiple bidders have already signed non-disclosure agreements and are engaged in due diligence.  On August 10, 2016, the employment of 321 Capital was approved in open Court, but a signed Order has not yet been entered.

20. As of the date of this Motion, Silk Route has not disbursed the balance of the outstanding draw request, and the Debtor has determined that Silk Route is either unable or unwilling to disburse the committed funds.

21. On or about August 8, 2016, John Fioretti of ABTV was appointed as the Debtor's Chief Restructuring Officer (the "CRO").  The CRO has the full and complete authority to manage the affairs of the Debtor. The CRO is currently evaluating the Debtor's business and affairs in order to determine whether to pursue reorganization, a sale process or alternative outcome for this chapter 11 case.

22. On August 10, 2016, this Court entered an Interim Order Granting Authority to Obtain Post-Petition Financing From SummitBridge National Investments IV, LLC [Docket No. 155], which authorized the Debtor, on an interim basis, to obtain post-petition financing of up to $500,000 from SummitBridge, secured by a priming lien on substantially all of the Debtor's assets, subject only to allowed PACA trust claims.  On August 10, 2016, SummitBridge advanced approximately $282,000 to the Debtor.

23. SummitBridge, the Debtor, the Committee, or another party in interest, may contend that the failure of Silk Route to advance funds as required under the credit agreement

gives rise to a breach of contract claim against Silk Route that creates a claim of offset, recoupment, or other basis to challenge the validity of Silk Route's post-petition indebtedness. Therefore, the claim of Silk Route is subject to a bona fide dispute and a sale free and clear of its asserted lien is authorized by 11 U.S.C. § 363(f)(4),

24. SummitBridge consents to this Motion, and therefore a sale free and clear of its lien is authorized by 11 U.S.C. § 363(f)(2).

## Proposed Sale

25. In this motion (the "Sale Motion"), the Debtor seeks approval of the sale of substantially all of the Debtor's assets free and clear of all claims, liens encumbrances and interests, pursuant to the sale procedures attached hereto as Exhibit A (the "Sale Procedures").

26. Subject to any final modifications or revisions to the Asset Purchase Agreement prior to the initial hearing on this Motion, the assets to be purchased pursuant to the Sales Procedures (the "Sale Assets") consist of all of the Debtor's (i) inventory, equipment, machinery, instruments, vehicles, furniture, fixtures and all other tangible property, (ii) prepaid expenses, credit card processing reserves and security deposits, (iii) accounts receivable, (iv) proprietary information, trade secrets and confidential information, technical information and data, trademarks, trade names, and service marks, including but not limited to the "A Southern Season" name and logo, (v) machinery and equipment warranties and service contracts, (vi) all other documentation related to the operation of the Store, including all licenses and permits necessary to the operation, (vii) all books and records related to the Sale Assets and the operation of the Debtor's stores, including all financial, accounting and property tax records, computer data and programs, market data, and records and all correspondence with and documents pertaining to suppliers, governmental authorities and other third parties, (viii) the Debtor's e-commerce online

store and platform, to include www.SouthernSeason.com, the Holiday Season print magazine and telephone call center, and associated goodwill and IP. Provided however, and notwithstanding any other provision herein, the Sale Assets do not include (i) the Debtor's cash, cash equivalents, bank deposits, funds in transit or tax refunds, (ii) any causes of action that are pending or may be brought by or on behalf of the Debtor, including those that may be brought by the Debtor pursuant to Chapter 5 of the Bankruptcy Code, (iii) any of the equipment, machinery or other tangible property, except for inventory, that was previously located at the Debtor's stores in Richmond, VA or Mount Pleasant, SC, and is currently located in the Debtor's distribution center, or (iv) security deposit(s) with respect to any lease(s) not assumed by the purchaser at closing (collectively, the "Excluded Assets").

27. The Debtor and The Focus Properties, Inc. (the "Stalking Horse Bidder") are in the process of finalizing a certain Asset Purchase Agreement, (the "Stalking Horse Agreement"), which shall be finalized and filed as a supplemental document to the motion . Pursuant to the Sale Procedures, any entity other than the Stalking Horse Bidder that is interested in purchasing the Sale Assets will be required to submit a definitive "Asset Purchase Agreement" specifying all terms and conditions of their offer, and bids may not be subject to further due diligence after or conditional upon obtaining financing in order to close the transaction after the auction sale. The Sale Assets shall not include any assets that are not specifically listed in the Asset Purchase Agreement.

28. The Sale Assets shall be sold "as is, where is," with no representations or warranties except for those contained in the Stalking Horse Agreement.

29. It is contemplated that the Stalking Horse Agreement will provide that the Debtor shall assume and assign to the Stalking Horse Bidder at Closing the real property leases with

respect to the following premises: (i) the Southern Season Store and Weathervane Restaurant at 201 S. Estes Drive, Chapel Hill, NC 27514, (ii) the "Taste Store" located at 443-B207 Daniels Street, Raleigh, NC 27605, and (iii) the "Taste Store" located at 4 Swan Street, Asheville, NC 28803 (collectively, the "Assumed Leases"). It is contemplated that the Stalking Horse Agreement shall provide that the Seller shall pay at Closing all cure costs necessary in connection with the assumption and assignment of the Assumed Leases (the "Assumed Leases Cure Costs"). No other leases of personal property or real property, nor any other executory contracts, shall be assumed by the Purchaser or assigned at Closing.

30. The Debtor believes the Assumed Leases Cure Costs with respect to the Southern Season Store and Weathervane Restaurant at 201 S. Estes Drive, Chapel Hill, NC 27514 will be $51,559.36, which is the rent payment due August 1, 2016.

31. The Debtor believes the Assumed Leases Cure Costs with respect to the "Taste Store" located at 443-B207 Daniels Street, Raleigh, NC 27605, are $12,931.61, which is the rent payment due August 1, 2016.

32. The Debtor believes the Assumed Leases Cure Costs with respect to the the "Taste Store" located at 4 Swan Street, Asheville, NC 28803, are $4,665.67, which is the security deposit due. Rent does not commence under this lease until October 1, 2016.

33. The Debtor requests that upon completion of the sale procedure and final hearing to consider the best and highest bid, the Court then enter an Order (the "Sale Order") to (i) approve the sale and transfer of the Sale Assets to any party submitting the highest and best bid, and (ii) transfer any and all claims, liens, encumbrances or interests in or upon the Sale Assets to the proceeds of sale.

34. The net sale proceeds from the sale of the Sale Assets shall be allocated as follows:

a. Payment of compensation and reimbursement of expenses to 321 Capital.

b. Then, payment of $62,000, to be held in the trust account of counsel for the Debtor, to be available for the payment of allowed PACA trust claims, and any remaining un

c. Then, payment of the entire amount of SummitBridge's post-petition indebtedness under the Interim Order Granting Authority to Obtain Post-Petition Financing From SummitBridge National Investments IV, LLC [Docket No. 155].

d. Then, an amount equal to actual Permitted Trailing Expenses excluding professional fees not to exceed $500,000, to be held in the trust account of counsel for the Debtor, to be available for the payment of Permitted Trailing Expenses as that term is defined in the existing cash collateral and DIP financing orders of the Court, to be disbursed pursuant to further order(s) of the Court. The remaining unexpended balance of the funds under this paragraph shall be disbursed pursuant to the sub-paragraphs (f), (g) and (h) below.

e. Then, $175,000, to be held in the trust account of counsel for the Debtor, to be available for payment of the professional fees of the Debtor's counsel, the Committee's counsel, and the Debtor's CRO (all right to charge additional professional fees under Section 506(c) shall be waived);

f. Then, two percent (_2%) of the remaining sale proceeds after the payment of the items in sub-paragraphs (a) through (e) above, to be placed in the trust account of counsel for the Debtor, which shall be carved-out from and not subject to any lien or security

interest of SummitBridge, shall be preserved for the benefit of the Debtor's bankruptcy estate, and shall be disbursed pursuant to further order(s) of the Court.

g. Then, all remaining sale proceeds after payment of the items in subparagraphs (a) through (f) above, up to but not to exceed the entire outstanding balance of SummitBridge's pre-petition indebtedness.

h. Then, any remaining sale proceeds, to be held in the trust account of counsel for the Debtor, which shall be disbursed pursuant to further order(s) of the Court.

35. The Debtor seeks authority to consummate an asset sale promptly in order to maximize the value of the Sale Assets for the benefit of creditors, and proposes the following schedule for the Sale Procedures, subject to the Court's approval:

| | |
|---|---|
| August 15, 2016 | Sale Procedures Hearing and entry of Sale Procedures Order |
| August 18, 2016 | Deadline to submit Initial Bids |
| August 19, 2016 | Auction |
| August 19, 2016 | Final Hearing |
| August 22, 2016 | Deadline for Sale Closing |

36. The Debtor seeks approval of the Sale Procedures in advance of the bid process, and in order to consummate the proposed transaction and thereby preserve value for the estate, the Debtor requests that the Court schedule and conduct an initial hearing (the "Sale Procedures Hearing") to:

a. Enter an Order (the "Sale Procedures Order") (i) approving the Sale Procedures, (ii) making the Notice Finding (as defined below), (iii) setting a deadline for any objection to the proposed sale, (iv) making such other findings as the Court deems necessary or appropriate under the circumstances, and (v) scheduling a second hearing

11

(the "Final Hearing") to finally hear all other aspects of the Sale Motion and to consider confirmation of the sale to the Prevailing Bidder (as defined in the Sale Procedures).

b. Find (the "Notice Finding") that adequate notice of the proposed public sale of the sale assets shall consist of mailing copies of (1) notice of the proposed sale (the "Notice") to all creditors and other parties in interest, and (2) the Sale Procedures Order to:

    i. The Bankruptcy Administrator.

    ii. Counsel for the Committee.

    iii. The creditors included on the list filed pursuant to Rule 1007, consisting of the twenty (20) largest unsecured creditors.

    iv. Any creditors asserting a lien upon any or all of the Sale Assets.

    v. Any party who has filed a notice of appearance and request for copies of any notices or pleadings filed in this bankruptcy case.

37. The Debtor will also provide copies of the Sale Procedure Order and the Notice to all entities who submit to the Debtor or to its counsel an expression of interest in purchasing the Sale Assets and written request for relevant materials.

WHEREFORE, the Debtor prays the Court for the following relief:

1. After notice and hearing, entry of a Sale Procedures Order (i) approving the Sale Procedures, (ii) approving the Notice, (iii) making the Notice Finding, (iv) making any other findings that the Court deems necessary or appropriate under the circumstances, and (v) setting a date for the Final Hearing to finally hear all other aspects of the Sale Motion and to consider confirmation of the sale to the Prevailing Bidder.

2. Upon conclusion of the Final Hearing, and after consideration of any competing bids, entry of the Sale Order (a) designating the Prevailing Bidder, (b) authorizing the sale of the

Sale Assets to the Prevailing Bidder free and clear of any and all claims, liens, encumbrances and interests, (c) finding that the Prevailing Bidder is a "good faith purchaser" pursuant to Section 363(m) of the Bankruptcy Code, and that none of the grounds set forth in Section 363(n) exist with respect to a sale to the Prevailing Bidder, (d) finding that one or more of the grounds for a sale free and clear pursuant to Section 363(f) of the Bankruptcy Code has been met as to each claim, lien, encumbrance or interest in any or all of the Sale Assets, and transferring any and all claims, liens, encumbrances and interests in or upon the Sale Assets to the proceeds of the sale, (e) authorizing the distribution of the sale proceeds as set forth herein, and (f) providing such other relief as the Debtor shall reasonably request.

Respectfully submitted on behalf of the Debtor, this the 12th day of August, 2016.

HUTSON LAW OFFICE, P.A.

/s/ Richard M. Hutson, II
Richard M. Hutson, II, NCSB #2282
hutson@hhplaw.com
302 E. Pettigrew St., Suite B-206
PO Drawer 2252-A
Durham, NC 27702

and

NORTHEN BLUE, LLP
/s/ John Paul H. Cournoyer
John Paul H. Cournoyer, NCSB #42224
jpc@nbfirm.com
1414 Raleigh Road, Suite 435
Chapel Hill, NC 27517
Telephone:  919-968-4441

*Counsel for the Debtor*

CONSENTED AND AGREED:

s/ Christopher P. Schueller
Counsel for SummitBridge

# EXHIBIT A
# SALE PROCEDURES

**AUCTION AND SALE PROCEDURES**

The following procedures (the "Sale Procedures") have been approved and authorized by order (the "Sale Procedures Order") of the United States Bankruptcy Court for the Middle District of North Carolina (the "Bankruptcy Court") in the chapter 11 case of Southern Season, Inc. (the "Debtor"), and shall govern the proposed sale (the "Sale"), including any auction (the "Auction") conducted in connection therewith, of certain assets of the Debtor, pursuant to Debtor's motion for an order authorizing the Sale and granting related relief (the "Sale Motion").

**1.     Sale Assets.** The assets to be purchased pursuant to these Sales Procedures (the "Sale Assets") consist of all of the Debtor's (i) inventory, equipment, machinery, instruments, vehicles, furniture, fixtures and all other tangible property, (ii) prepaid expenses, credit card processing reserves and security deposits, (iii) accounts receivable, (iv) proprietary information, trade secrets and confidential information, technical information and data, trademarks, trade names, and service marks, including but not limited to the "A Southern Season" name and logo, (v) machinery and equipment warranties and service contracts, (vi) all other documentation related to the operation of the Store, including all licenses and permits necessary to the operation, (vii) all books and records related to the Sale Assets and the operation of the Debtor's stores, including all financial, accounting and property tax records, computer data and programs, market data, and records and all correspondence with and documents pertaining to suppliers, governmental authorities and other third parties, (viii) the Debtor's e-commerce online store and platform, to include www.SouthernSeason.com, the Holiday Season print magazine and telephone call center, and associated goodwill and IP.  Provided however, and notwithstanding any other provision herein, the Sale Assets do not include (i) the Debtor's cash, cash equivalents, bank deposits, funds in transit or tax refunds, (ii) any causes of action that are pending or may be brought by or on behalf of the Debtor, including those that may be brought by the Debtor pursuant to Chapter 5 of the Bankruptcy Code, (iii) any of the equipment, machinery or other tangible property, except for inventory, that was previously located at the Debtor's stores in Richmond, VA or Mount Pleasant, SC, and is currently located in the Debtor's distribution center, or (iv) security deposit(s) with respect to any lease(s) not assumed by the purchaser at closing (collectively, the "Excluded Assets").

**2.     Free of Liabilities and Liens.**  The Sale Assets shall be sold without assumption of liabilities and free of liens.  The Sale Assets shall be sold pursuant to, and to the fullest extent permitted by, 11 U.S.C. § 363(f) and all other applicable laws free and clear of any and all liens, security interests, encumbrances and claims (including, but not limited to, any "claims" as defined in 11 U.S.C. § 101(5)), reclamation claims, mortgages, deeds of trust, pledges, covenants, restrictions, hypothecations, charges, indentures, loan agreements, causes of action, instruments, contracts, leases, licenses, options, rights of first refusal, offsets, recoupment, rights of recovery, judgments, orders and decrees of any court or foreign or domestic governmental entity, claims for reimbursement, successor liability, contribution, indemnity or exoneration, assignment, preferences, debts, charges, suits, rights of recovery, interests, products liability, alter-ego, environmental, tax and other liabilities, and in each case whether secured or unsecured, choate or inchoate, filed or unfiled, scheduled or unscheduled, noticed or unnoticed, recorded or unrecorded, perfected or unperfected, allowed or disallowed, contingent or non-contingent, liquidated or unliquidated, matured or unmatured, material or non-material, disputed or undisputed, or known or unknown, whether arising prior to, on, or subsequent to the Petition Date, whether imposed by agreement, understanding, law, equity or otherwise (collectively, the

"Liens and Claims"), with any Liens and Claims to attach only to the proceeds of sale of the Sale Assets with the same priority, validity, force and effect as they existed with respect to the Sale Assets before the Closing Date. Any party holding a secured claim and electing to exercise its right to credit bid pursuant to 11 U.S.C. § 363(k), must make such credit bid in the context of a bid on all of the Sale Assets.

**3.    Sale Means.**  The Auction Sale shall be an absolute auction subject only to confirmation by the Court at the Final Hearing that the Auction and Sale Procedures Order was followed and that an Acceptable Bidder was the Highest Bidder.

**4.    Time and Date of Auction.**  The Auction Sale shall commence at later of (i) 8:30 a.m. Eastern, on August 19, 2016, or (ii) one hour following the completion of any hearing conducted pursuant to paragraph 14 below.

**5.    Location of Auction.**  The Auction Sale shall take place in the offices of Northen Blue, LLP, 1414 Raleigh Road, Suite 435, Chapel Hill, NC 27517.

**6.    Purchase Price.**  The Purchase Price offered by The Focus Properties, Inc. ("Focus") in the Asset Purchase Agreement is Three Million Five Hundred Thousand Dollars and No Cents ($3,500,000.00).

**7.    Breakup Fee.**  A fee (the "Breakup Fee") shall be paid to Focus at closing as a breakup fee in the amount of $150,000 in the event the Sale Assets are sold at the Auction Sale and Focus is not the Highest Bidder.  The Breakup Fee is deemed earned and shall be paid in consideration of the substantial costs and expense incurred by Focus to move forward with the negotiation and preparation of the Asset Purchase Agreement and other definitive agreements and with all other pleadings and hearings necessary to obtain Court approval of the Asset Purchase Agreement, the Auction and Sale Procedures Order and the conduct of the Auction Sale; and in recognition of the benefit gained by the Debtor in allowing Focus's offer, as set forth herein, to be subject to a higher bid pursuant to the Auction Procedures.

**8.    No Financing Contingency.**  The Auction Sale is not subject to Focus or any Acceptable Bidder obtaining financing.

**9.    No Due Diligence Contingency.**  Focus and any other Acceptable Bidders shall complete any and all due diligence prior to the Auction Sale, and the sale to Focus or any other Acceptable Bidder shall not be subject to the completion of any due diligence after the Auction Sale.

**10.    Acceptable Bidder.**

(1)    An Acceptable Bidder is a party who has provided all of the following to the Debtor's counsel, John Paul H. Cournoyer, Northen Blue, LLP, 1414 Raleigh Road, Suite 435, Chapel Hill, NC, 27517, on or before 4:00 p.m. Eastern on August 18, 2016:

> (a)    A bid (an "Acceptable Qualifying Bid") for all the Sale Assets shall be in the minimum amount of $3,800,000, which is equal to the Focus bid of $3,500,000 plus the sum of (i) the Breakup Fee, and (ii) $150,000.

16

      (b)    A cash deposit in the amount of $100,000 (the "Acceptable Bidder Deposit"), which shall be placed in the Debtor's counsel's trust account. Because it is possible that the Highest Bidder (as defined infra) may default and fail to close, any deposit paid by an Acceptable Bidder shall not be returned to such Acceptable Bidder until the sale of the Debtor's assets is closed. The deposit shall be returned by first-class mail to the address and entity which the Acceptable Bidder in writing has instructed the attorney for the Debtor to return the deposit. If an Acceptable Bidder desires that the deposit be returned by wire transfer, then said instructions for said wire transfer shall be provided to the Debtor's attorney upon submission of the deposit. Failure of the Acceptable Bidder to provide proper instructions for the return of deposit will authorize Debtor's attorney to hold said deposit pending written instructions.

      (c)    An executed asset purchase agreement including terms that are substantially similar to, and no less favorable to the Debtor than, the terms in the Asset Purchase Agreement and is a firm offer not containing any contingencies to the validity, effectiveness or binding nature of the offer, including, without limitation, contingencies for financing or due diligence past the Auction Sale.

      (d)    A signed confidentiality agreement, to the extent not previously provided.

(2)    Upon timely receipt by the Debtor of a signed confidentiality agreement from a prospective Acceptable Bidder, the Debtor shall promptly provide to such person such financial information as the Debtor believes to be reasonably appropriate, but not less than such financial information that has been provided to Focus.

(3)    Counsel for the Debtor shall promptly, and in no event later than one business day after receipt of all of the documents and the deposit described in paragraph 10(1) above, provide counsel for Focus, counsel for the Unsecured Creditors' Committee, the Bankruptcy Administrator, counsel for SummitBridge National Investments IV, LLC ("SummitBridge"), and any secured creditor who has requested notification in writing (or their counsel if they have appeared through counsel), the name of each Acceptable Bidder and a copy of its bid.

(4)    The Debtor shall promptly, but no later than 5:00 p.m. Eastern on August 18, 2016, inform the prospective Acceptable Bidder whether the Debtor designates the prospective Acceptable Bidder as an Acceptable Bidder or takes the position, based upon evidence presented, that said party should not be so designated.

(5)    Focus shall be deemed to be an Acceptable Bidder based upon its execution of the Asset Purchase Agreement. SummitBridge shall also be deemed an Acceptable Bidder with the authority to credit bid the full value of its pre and post-petition loan balance at the Auction, except for the disbursements set forth in paragraphs 34(a), (b), (d), (e) and (f) of the Sale Motion, which shall be paid in cash.

**11.     No Auction if No Acceptable Bidder Other than Focus**.  If there is no Acceptable Bidder other than Focus, then the bid/offer by Focus pursuant to the Asset Purchase Agreement shall be deemed the highest and best offer for the Purchased Assets and there shall be no Auction Sale.  In such event, Focus shall be deemed the Highest Bidder as defined infra.

**12.     Opening Bid**.  The Opening Bid shall be deemed the highest Acceptable Qualifying Bid.  To the extent that two Acceptable Qualifying Bids are identical in amount, then the first in time, determined by the receipt of the Acceptable Bid Deposit, shall be deemed the Opening Bid at the Auction Sale.

**13.     Acceptable Upset Bids.**  At the Auction Sale, an Acceptable Upset Bid may be made by any Acceptable Bidder.  The first Acceptable Upset Bid must be in an amount equal to or greater than $50,000 in excess of the Opening Bid.  Thereafter, Acceptable Upset Bids must exceed the previous Acceptable Upset Bid by an amount equal to or greater than $50,000.  The ultimate highest bidder shall be referred to herein as the "Highest Bidder" and its bid the "Highest Upset Bid."

**14.     Acceptable Bidder Dispute Resolution.**  In the event there is a dispute between a prospective Acceptable Bidder and the Debtor as to whether said prospective Acceptable Bidder should be designated an Acceptable Bidder, the parties shall notify the Court, and the Court shall hold a hearing to determine whether said prospective Acceptable Bidder should be designated an Acceptable Bidder.  This hearing may be held upon an emergency telephonic notice basis as deemed appropriate in the sole discretion of the Court.

**15.     How to Make an Upset Bid.**  A valid Acceptable Upset Bid may be made only by a person who satisfies the conditions set forth in these Auction and Sale Procedures to qualify as an Acceptable Bidder.

**16.     Irrevocable Nature of Bids**.  The Acceptable Upset Bid made by the Highest Bidder shall remain open and be irrevocable through the Final Hearing and, if the Highest Bid is determined at such hearing to be approved as the final Acceptable Bid, the Highest Bid shall remain open and be irrevocable through the Closing Date.

**17.     Finality of Auction Process.** The Highest Upset Bid of the Highest Bidder is not subject to any upset bid after the close of the Auction Sale or at the Final Hearing.

**18.     Highest Bidder Deposit.**  The Highest Bidder shall cause to be deposited with the Debtor an amount in addition to its Acceptable Bidder Deposit such that the total amount of such deposit is equal to ten percent (10%) of the Highest Bid (the "Highest Bidder Deposit"). The Highest Bidder Deposit shall be submitted and shall represent good funds on deposit with the Debtor on or before Noon of the first business day following the Auction Sale. If SummitBridge is the Highest Bidder, it shall not be required to post a deposit.

**19.     Final Hearing.** A final hearing will be held on August 19, 2016 at 4:00 p.m. Eastern, in the U.S. Bankruptcy Court, Venable Center, Dibrell Building - Suite 280, 302 East Pettigrew Street, Durham, NC  27701 (the "Final Hearing").  It shall be the purpose of the Final Hearing to confirm that the procedures as set forth in the Auction and Sale Procedures have been followed by the Debtor and the Auction Sale conducted in accordance with the same, to approve the sale

of the Sale Assets, to approve the proposed distributions of the proceeds of the Sale Assets, and to make such findings as are necessary to provide the purchaser with proper title in accordance with the terms and conditions of the Asset Purchase Agreement and the Sale Procedures Order.

**20.    Closing Date.**  The Closing Date shall be deemed to be the date upon which the consideration is paid and all closing documents are signed.  This may take place immediately after the Final Hearing but must occur no later than August 22, 2016, provided that the Sale Approval Order has been entered by August 19, 2016, unless the Sale Approval Order is subject to a stay, in which case, closing shall occur within three (3) business days after such stay is terminated and the Sale Approval Order remains effective.

**21.    Failure of Highest Bidder to Close.**  In the event there is an Auction Sale and the Highest Bidder defaults or fails to close the sale transaction, then the Acceptable Upset Bid that is the prior high bid for the Sale Assets shall be deemed to be the new Highest Bidder and the purchase price shall be the amount of such prior high bid.  The new Highest Bidder shall be required to comply with the deposit requirements outlined in paragraph 19 and shall be bound through closing at its prior high bid, with the deposit to remain on hand.

**22.    Payment of Breakup Fee.** If the Sale Assets are sold to an Acceptable Bidder other than Focus, then at the closing of such sale, the Debtor shall pay, or cause to be paid, to Focus the Breakup Fee in immediately available funds.

**23.    Absolute Sale.** The Court, pursuant to Bankruptcy Rule 6004(h), will authorize the Debtor to close the sale of the Sale Assets immediately upon entry of the Sale Approval Order following the Final Hearing.

**24.    Necessary Findings for Purchaser.** A sale conducted pursuant to the procedures set forth herein shall result in the Sale Assets being sold to the Highest Bidder as a good-faith purchaser.  Said purchaser shall acquire all rights as can be conveyed pursuant to 11 U.S.C. § 363, including but not limited to the rights of a good faith purchaser under 11 U.S.C. § 363(m), and a finding, based upon the sworn representation of the Highest Bidder that the bidding was not pursuant to any improper collusive bidding practices, which would not allow for the sale to be avoided for reasons which would include 11 U.S.C. § 363(n).

**25.    Dispute Resolution**.  The Court shall retain exclusive jurisdiction to resolve any disputes that may arise concerning these Auction and Sale Procedures or other issues relevant to the Debtor's sale of the Sale Assets as set forth herein.

**26.    Business Judgment**. The Debtor, upon consultation with the Committee and SummitBridge, may exercise its reasonable business judgment in conducting the Auction Sale and in allowing a reasonable time for bids by Acceptable Bidders once the Auction Sale is commenced; however, it is intended that once commenced, the Auction Sale shall proceed to its conclusion without being continued to a subsequent day, and the Debtor upon consultation with the Committee and SummitBridge may determine in its business judgment when to close the Auction Sale, declare the Highest Bid, and preclude further bids.  The Debtor may exercise its reasonable business judgment to recommend to the Court the Highest Bid.

**27.** **Executory Contracts.** The Assigned Leases, as defined and set forth in the Asset Purchase Agreement, shall be assumed by the Debtor and assigned to Focus, or such other Highest Bidder, at closing pursuant to order of the Court, with Focus, or such other Highest Bidder, to pay all cure amounts.

**28.** **No Representations or Warranties. The Purchased Assets are being sold "as is" and "where is" and Focus, or any ultimate Highest Bidder, hereby acknowledges and agrees that, except as otherwise expressly provided in the Asset Purchase Agreement, the Debtor makes no representations or warranties whatsoever, express or implied, with respect to any matter relating to the Sale Assets. Without in any way limiting the foregoing, the Debtor hereby disclaims any warranty, expressed or implied, of merchantability or fitness for any particular purpose as to any portion of the Sale Assets. Focus and/or any ultimate Highest Bidder further acknowledges that said party has conducted (or will have conducted prior to the Auction Date) an independent inspection and investigation of the physical condition of the Sale Assets as said party deems necessary or appropriate to the extent that they desire such. Focus or the Highest Bidder will accept the Sale Assets at closing "as is" and "where is."**