**SO ORDERED.**

**SIGNED this 21st day of August, 2016.**



BENJAMIN A. KAHN
UNITED STATES BANKRUPTCY JUDGE

---

# UNITED STATES BANKRUPTCY COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
### DURHAM DIVISION

-------------------------------------------------------------x
In re           :   **Chapter 11**
                :
**SOUTHERN SEASON,**      :
                :   **Case No. 16-80558**
      **Debtor**     :
-------------------------------------------------------------x

## ORDER (I) APPROVING THE ASSET PURCHASE AGREEMENT BETWEEN THE DEBTOR AND CALVERT RETAIL, L.P., (II) AUTHORIZING THE SALE OF CERTAIN OF THE DEBTOR'S ASSETS FREE AND CLEAR OF LIENS, CLAIMS, INTERESTS AND ENCUMBRANCES, (III) AUTHORIZING THE ASSUMPTION AND ASSIGNMENT OF A CERTAIN LEASE AND (IV) GRANTING RELATED RELIEF

Upon the Motion to (A) Approve Sale of Substantially All Assets, (B) Establish Related Sale Procedures, (C) Transfer Any and All Claims, Liens, Encumbrances and Interests in Sale Assets to Proceeds of Sale, (D) Approve Form and Manner of Notice of Sale, (E) Assume and Assign Certain Real Property Leases, and (F) Schedule Hearings dated August 12, 2016 (Docket No. 163) (the "Sale Motion"),[1] filed by the above-captioned debtor and debtor in possession (the "Debtor") seeking, among other things, entry of an order (a "Sale Order"), pursuant to sections 105, 363 and 365 of the United States Bankruptcy Code, 11 U.S.C. §§ 101, *et seq.* (the

---

[1] Capitalized terms used herein but not otherwise defined have the meanings given to them in the Purchase Agreement (as defined below) or, if not defined therein, the meanings given to them in the Sale Motion.

"Bankruptcy Code"), Rules 2002, 6004, and 6006 of the Federal Rules of Bankruptcy Procedure

(the "Bankruptcy Rules") authorizing and approving the sale of certain of the Debtor's assets and

the assumption and assignment of certain executory contracts and unexpired leases of the

Debtor; and the Court having considered the Sale Motion on August 15, 2016 for the purpose of

ruling on the bidding procedures requested in the Sale Motion; and the Court having entered an

Order Approving Bidding Procedures, Break-Up Fee, and Form and Manner of Notice Thereof

With Respect to the Proposed Sale of Assets by the Debtor to The Focus Properties, Inc., dated

August 16, 2016 (Docket No. 186) (the "Bidding Procedures Order"), approving procedures for

the sale or disposition of the Debtor's assets, including executory contracts, unexpired leases and

assets related thereto (the "Bidding Procedures") and granting certain related relief, including

selection of The Focus Properties, Inc. ("Focus") as stalking horse purchaser; and the Court

having requested certain changes to Focus' asset purchase agreement, and Focus having been

unwilling to agree to such changes; and the Debtor then selecting Calvert Retail, L.P. (the

"Buyer") as a substitute stalking horse purchaser and entering into that certain Asset Purchase

Agreement dated August 17, 2016 (the "Purchase Agreement"); and the Debtor on August 17,

2016 having filed the Motion For An Order Authorizing Substitution of Calvert Retail L.P. as

Stalking Horse Bidder to ask the Court to substitute the Buyer for Focus as stalking horse

purchaser and to approve the Purchase Agreement; and the Court having entered the Order

Authorizing Substitution of Calvert Retail, L.P. as Stalking Horse Bidder on August 17, 2016;

and the Debtor having thereafter conducted an auction on August 19, 2016 pursuant to and in

accordance with the Bidding Procedures (the "Auction"); and at the Auction the Buyer having

submitted the highest and best offer for all assets included as "Sale Assets" identified in the

Purchase Agreement including without limitation the lease (the "Lease") for the Debtor's Chapel

Hill flagship operations (collectively the "Acquired Assets"), which was the successful bid for the Acquired Assets at the Auction; [and upon each of the objections and other pleadings filed in response to the Sale Transaction (as defined below) and the Debtor's reply thereto;] and the Court having conducted a hearing on the Sale Motion (the "Sale Hearing") on August 19, 2016, at which time all interested parties were offered an opportunity to be heard with respect to the Sale Transaction (as defined below); and the Court having reviewed and considered (i) the Sale Motion and the exhibits thereto, (ii) the Purchase Agreement, a copy of which is attached hereto at Exhibit A, whereby the Debtor has agreed, among other things, to sell the Acquired Assets to Buyer, including the Lease that will be assumed and assigned to Buyer, on the terms and conditions set forth in the Purchase Agreement (collectively, the "Sale Transaction"), and (iii) the arguments and representations of counsel made, and the evidence proffered and adduced, at the Sale Hearing; and it appearing that due notice of the Sale Motion, the Purchase Agreement and the form of this order (the "Proposed Sale Order") having been provided; and all objections to the Sale Motion having been withdrawn, resolved or overruled as provided in this Sale Order; and it appearing that the relief requested in the Sale Motion and granted herein is in the best interests of the Debtor, its estate and creditors and all parties in interest in this chapter 11 case; and upon the record of the Sale Hearing and this chapter 11 case; and after due deliberation thereon; and good cause appearing therefor, it is hereby

**FOUND AND DETERMINED THAT:**

A. **Fed. R. Bankr. P. 7052**. The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052 made applicable to this proceeding pursuant to Bankruptcy Rule 9014. To the extent any of the

following findings of fact constitute conclusions of law, they are adopted as such. To the extent

any of the following conclusions of law constitute findings of fact, they are adopted as such.

B.    **Jurisdiction and Venue**.  This Court has jurisdiction to decide the relief

requested in the Sale Motion and over the Sale Transaction and the property of the Debtor's

estate, including the Acquired Assets, pursuant to 28 U.S.C. §§ 157(a)-(b) and 1334(b).  This

matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).  Venue of these chapter 11 cases

and the Sale Motion in this District is proper under 28 U.S.C. §§ 1408 and 1409.

C.    **Statutory and Rule Predicates**.  The statutory and other legal predicates for the

relief sought in the Sale Motion are sections 105(a), 363 and 365 of the Bankruptcy Code, and

Bankruptcy Rules 2002, 6004, and 6006.

D.    **Notice and Opportunity to Object**.  Actual written notice of, and a fair and

reasonable opportunity to object to and to be heard with respect to the Sale Motion, the Sale

Transaction, the sale of the Acquired Assets free and clear of any Claims (as defined below), the

assumption and assignment of the Lease and the relief requested in the Sale Motion has been

given, as required by the Bankruptcy Code and the Bankruptcy Rules, to all persons entitled to

notice pursuant to the Bidding Procedures, including, but not limited to, the following: (i) all

non-Debtor parties to the Debtor's leases, including the Lease, (ii) all parties who have requested

notice in this chapter 11 case pursuant to Bankruptcy Rule 2002, (iii) all applicable federal, state,

and local taxing and regulatory authorities, and (iv) all of the Debtor's known creditors.

E.    **Final Order**.  This Sale Order constitutes a final order within the meaning of 28

U.S.C. § 158(a).

F.    **Sound Business Purpose**.  The Debtor has demonstrated good, sufficient, and

sound business purposes and justifications for approval of the Purchase Agreement and the Sale

Transaction and in entering into the Purchase Agreement and all related bills of sale, intellectual property assignments and Lease assignments and any other documents required to transfer the Acquired Assets (collectively, the "Related Agreements") to the Buyer.   The Debtor's entry into and performance under the Purchase Agreement and Related Agreements (i) is a result of due deliberation by the Debtor and constitute a sound and reasonable exercise of the Debtor's business judgment consistent with its fiduciary duties, (ii) provide value to and are beneficial to the Debtor's estate, and are in the best interests of the Debtor and its stakeholders, and (iii) are reasonable and appropriate under the circumstances.   Business justifications for the Sale Transaction include, but are not limited to, the following: (i) the Purchase Agreement constitutes the highest and best offer received for the Acquired Assets; (ii) the Purchase Agreement presents the best opportunity to maximize the value of the Acquired Assets and avoid decline and devaluation of the Acquired Assets; (iii) unless the Sale Transaction and all of the other transactions contemplated by the Purchase Agreement are concluded expeditiously, as provided for pursuant to the Purchase Agreement, recoveries to creditors may be materially diminished; and (iv) the value of the Debtor's estate will be maximized through the sale of the Acquired Assets pursuant to the Purchase Agreement.

G.     **Compliance with Procedures**.  The Debtor and the Buyer complied with the Bidding Procedures in all respects.  The Buyer was the successful bidder for the Acquired Assets in accordance with the Bidding Procedures.

H.     **Highest and Best Value**.  (i) The Debtor and its advisors, including 321 Capital, engaged in a robust and extensive marketing and sale process for the Acquired Assets, (ii) the Debtor conducted a fair and open sale process, (iii) the sale process and the Auction were non-collusive, duly noticed and provided a full, fair and reasonable opportunity for any entity to

make an offer to purchase the Acquired Assets, and (iv) the process conducted by the Debtor pursuant to the Bidding Procedures obtained the highest and best value for the Acquired Assets for the Debtor and its estate, and any other transaction would not have yielded as favorable an economic result.

I.      **Fair Consideration**.  The consideration to be paid by Buyer under the Purchase Agreement (i) constitutes fair and reasonable consideration for the Acquired Assets, (ii) is the highest and best offer for the Acquired Assets, (iii) will provide a greater recovery for the Debtor's estate and creditors than would be provided by any other practically available alternative, and (iv) constitutes reasonably equivalent value and fair consideration under the Bankruptcy Code and other laws of the United States, any state, territory, possession or District of Columbia or any other applicable jurisdiction with laws substantially similar to the foregoing.

J.      **No Successor or Other Derivative Liability**.  Buyer is not, and will not be, a mere continuation, and is not holding itself out as a mere continuation, of the Debtor or its estate and there is no continuity between Buyer and the Debtor.  The Sale Transaction does not amount to a consolidation, merger or *de facto* merger of Buyer and the Debtor.

K.      **Good Faith; No Collusion**.  The Debtor and the Buyer, and their respective counsel and advisors, have negotiated, proposed and entered into the Purchase Agreement and the Sale Transaction contemplated therein in good faith, without collusion and from arm's-length bargaining positions.  Buyer is a "good faith purchaser" and is acting in good faith within the meaning of section 363(m) of the Bankruptcy Code and, as such, is entitled to all the protections afforded thereby.   The Buyer has proceeded in good faith in all respects in that, among other things, (i) the Buyer recognized that the Debtor was free to deal with any other party in interest in acquiring the Acquired Assets and (ii) all payments to be made by the Buyer and all other

material agreements or arrangements entered into by the Buyer and the Debtor in connection with the Sale Transaction have been disclosed and are appropriate.  The sale price in respect of the Acquired Assets was not controlled by any agreement among potential purchasers and neither the Debtor nor the Buyer have engaged in collusion or any conduct that would cause or permit the Purchase Agreement to be avoided or costs and damages to be imposed under section 363(n) of the Bankruptcy Code.  Accordingly, neither the Purchase Agreement nor the Sale Transaction may be avoided and no party shall be entitled to damages or other recovery pursuant to section 363(n) of the Bankruptcy Code.    The Buyer is not an "insider" or "affiliate" of the Debtor, as those terms are defined in section 101 of the Bankruptcy Code, and no common identity of incorporators, directors, or controlling stockholders existed between the Buyer and the Debtor.

L.    **Notice**.  As evidenced by the certificates of service filed with the Court: (i) due, proper, timely, adequate and sufficient notice of the Sale Motion, the Sale Hearing, the Sale Transaction and the Proposed Sale Order and the other relief requested in the Sale Motion was provided by the Debtor; (ii) such notice was good, sufficient and appropriate under the particular circumstances and complied with the Bidding Procedures Order; and (iii) no other or further notice of the Sale Motion, the Sale Transaction, the Sale Hearing, the Proposed Sale Order or any of the relief requested in the Sale Motion is required.

M.    **Satisfaction of Section 363(f) Standards**.  The Debtors may sell the Acquired Assets free and clear of all liens, claims (including those that constitute a "claim" as defined in section 101(5) of the Bankruptcy Code), reclamation claims, mortgages, deeds of trust, pledges, covenants, restrictions, hypothecations, charges, indentures, loan agreements, causes of action, instruments, contracts, leases, licenses, options, rights of first, refusal, offsets, recoupment, rights

of recovery, judgments, orders, decrees of any court or foreign or domestic governmental entity, claims for reimbursement, successor liability, contribution, indemnity or exoneration, assignment, preferences, debts, charges, suits, rights of recovery, interests, products liability, alter-ego, environmental, tax or other liabilities, and in each case, whether secured or unsecured, choate or inchoate, filed or unfiled, scheduled or unscheduled, noticed or unnoticed, recorded or unrecorded, perfected or unperfected, allowed or disallowed, contingent or non-contingent, liquidated or unliquidated, matured or unmatured, material or non-material, disputed or undisputed, or known or unknown, whether arising prior to, on, or subsequent to the Petition Date, whether imposed by agreement, understanding, law, equity or otherwise (collectively, the "Claims"). All persons having Claims of any kind or nature whatsoever against the Debtor or the Acquired Assets shall be forever barred, estopped and permanently enjoined from pursuing or asserting such Claims against Buyer or any of its assets, property, affiliates, successors, assigns or the Acquired Assets.

N.    Summitbridge National Investment IV, LLC  ("Lender") has consented to and does not oppose the sale of the Acquired Assets to the Buyer pursuant to the Purchase Agreement free and clear of any Claims for Lender against the Acquired Assets.  Additionally, the claims of Silk Route and Sysco Raleigh Inc. are subject to bona fide disputes pursuant to 11 U.S.C. § 363(f)(4).

O.    Buyer would not have entered into the Purchase Agreement and would not consummate the transactions contemplated thereby if the sale of the Acquired Assets was not free and clear of all Claims, or if Buyer would, or in the future could, be liable for any such Claims, including, as applicable, certain liabilities related to the operation the Debtor's business that will not be assumed by Buyer, as described in the Purchase Agreement.  A sale of the

Acquired Assets other than one free and clear of all Claims would adversely impact the Debtor, its estate and creditors, and would yield substantially less value for the Debtor's estate, with less certainty than the Sale Transaction.

P.       The total consideration to be provided under the Purchase Agreement reflects Buyer's reliance on this Sale Order to provide it, pursuant to sections 105(a) and 363(f) of the Bankruptcy Code, with title to and possession of the Acquired Assets free and clear of all Claims (including, without limitation, any potential derivative, vicarious, transferee or successor liability claims).

Q.       **Assumption and Assignment of the Lease**.  The assumption and assignment of the Lease is integral to the Purchase Agreement, is in the best interests of the Debtor and its estate, and represents the reasonable exercise of the Debtor's sound business judgment. Specifically, the assumption and assignment of the Lease (i) is necessary to sell the Acquired Assets to Buyer, (ii) will limit the losses suffered by counterparties to the Lease, and (iii) maximizes the recoveries to other creditors of the Debtor by limiting the amount of claims against the Debtor's estate by avoiding rejection of the Lease.

R.       With respect to the Lease, the Debtor has met all requirements of section 365(b) of the Bankruptcy Code.  Further, Buyer has provided adequate assurance of future performance under the Lease in satisfaction of sections 365(b) and 365(f) of the Bankruptcy Code to the extent that any such assurance is required and not waived by the counterparties to such Lease. Accordingly, the Lease may be assumed by the Debtor and assigned to Buyer as provided for in the Purchase Agreement.

S.       **Validity of the Transfer**.  As of the Closing, the transfer of the Acquired Assets to Buyer will be a legal, valid and effective transfer of the Acquired Assets, and will vest Buyer

with all right, title and interest of the Debtor in and to the Acquired Assets, free and clear of all

Claims.  The consummation of the Sale Transaction is legal, valid and properly authorized under

all applicable provisions of the Bankruptcy Code, including, without limitation, sections 105(a),

363(b), 363(f), 363(m), 365(b) and 365(f) of the Bankruptcy Code and all of the applicable

requirements of such sections have been complied with in respect of the Sale Transaction.

T.      The Debtor (i) has full corporate power and authority to execute the Purchase

Agreement and all other documents contemplated thereby, and the Sale Transaction has been

duly and validly authorized by all necessary corporate action of the Debtor, (ii) has all of the

corporate power and authority necessary to consummate the transactions contemplated by the

Purchase Agreement, and (iii) upon entry of this Sale Order, other than any consents identified in

the Purchase Agreement, needs no consent or approval from any other person to consummate the

Sale Transaction.

U.      The Acquired Assets constitute property of the Debtor's estate and good title is

vested in the Debtor's estate within the meaning of section 541(a) of the Bankruptcy Code. The

Debtor is the sole and rightful owner of the Acquired Assets, and no other person has any

ownership right, title, or interests therein.

V.      The Purchase Agreement is a valid and binding contract between the Debtor and

Buyer and shall be enforceable pursuant to its terms.  The Purchase Agreement was not entered

into for the purpose of hindering, delaying or defrauding creditors under the Bankruptcy Code or

under laws of the United States, any state, territory, possession or the District of Columbia.  The

Purchase Agreement and the Sale Transaction itself, and the consummation thereof, shall be

enforceable against and binding upon (without posting any bond) the Debtor, any chapter 7 or

chapter 11 trustee appointed in this chapter 11 case, and shall not be subject to rejection or avoidance by the foregoing parties or any other person.

W.    **Waiver of Bankruptcy Rules 6004(h) and 6006(d)**.  The sale of the Acquired Assets must be approved and consummated promptly in order to preserve the value of the Acquired Assets.  Therefore, time is of the essence in consummating the Sale Transaction, and the Debtor and Buyer shall close the Sale Transaction no later than August 22, 2016.  The Debtor has demonstrated compelling circumstances and a good, sufficient, and sound business purpose and justification for the immediate approval and consummation of the Sale Transaction as contemplated by the Purchase Agreement.  Accordingly, there is sufficient cause to except the effectiveness of this Order from Bankruptcy Rules 6004(h) and 6006(d) with regards to the transactions contemplated by this Sale Order.

X.    **Legal and Factual Bases**.  The legal and factual bases set forth in the Sale Motion and at the Sale Hearing establish just cause for the relief granted herein.

**NOW THEREFORE, IT IS ORDERED THAT**:

1.    **Motion is Granted**.  The Sale Motion and the relief requested therein is granted and approved as set forth herein.

2.    **Objections Overruled**.  All objections, if any, to the Sale Motion or the relief requested therein that have not been withdrawn, waived or settled as announced to the Court at the Sale Hearing or by stipulation filed with the Court, and all reservations of rights included therein, are hereby overruled on the merits.

3.    **Notice**.  Notice of the Sale Motion, Sale Transaction, and Sale Hearing was fair and equitable under the circumstances and complied in all respects with section 102(1) of the Bankruptcy Code and Bankruptcy Rules 2002, 6004 and 6006.

4.      **Fair Purchase Price**.  The consideration provided by Buyer under the Purchase Agreement is fair and reasonable and constitutes (i) reasonably equivalent value under the Bankruptcy Code and the Uniform Fraudulent Transfer Act, (ii) fair consideration under the Uniform Fraudulent Conveyance Act, and (iii) reasonable equivalent value, fair consideration and fair value under any other applicable laws of the United States, any state, territory or possession or the District of Columbia.

5.      **Approval of the Purchase Agreement**.  The Purchase Agreement, the Related Agreements, the Sale Transaction contemplated therein (including but not limited to all ancillary agreements contemplated thereby) and all of the terms and conditions thereof are hereby approved.  The failure specifically to include any particular provision of the Purchase Agreement in this Sale Order shall not diminish or impair the effectiveness of such provision, it being the intent of the Court that the Purchase Agreement (including, but not limited to, all ancillary agreements contemplated thereby) be authorized and approved in its entirety.

6.      **Consummation of Sale Transaction**.  Pursuant to sections 105, 363 and 365 of the Bankruptcy Code, the Debtor, as well as its officers, employees and agents, are authorized to execute, deliver and perform their obligations under and comply with the terms of the Purchase Agreement and the Related Agreements and to consummate the Sale Transaction, pursuant to and in accordance with the terms and conditions of the Purchase Agreement and this Sale Order.

7.      The Debtor, its affiliates and their respective officers, employees and agents, are authorized to execute and deliver, and authorized to perform under, consummate and implement all additional instruments and documents that may be reasonably necessary or desirable to implement the Purchase Agreement and to take all further actions as may be (a) reasonably requested by Buyer for the purpose of assigning, transferring, granting, conveying and conferring

to Buyer, or reducing to possession, the Acquired Assets or (b) necessary or appropriate to the performance of the obligations contemplated by the Purchase Agreement, all without further order of the Court.

8.      All persons that are currently in possession of some or all of the Acquired Assets are hereby directed to surrender possession of such Acquired Assets to Buyer as of the Closing. To the extent required by the Purchase Agreement, the Debtor agrees to exercise commercially reasonable efforts to assist the Buyer in assuring that all persons that are presently, or on the applicable Closing Date may be, in possession of some or all of the Acquired Assets will surrender possession of the Acquired Assets to either (i) the Debtor before the applicable Closing Date or (ii) the Buyer on or after the applicable Closing Date.

9.      **Transfer of Assets Free and Clear**.  Pursuant to sections 105(a), 363(b), 363(f) and 365 of the Bankruptcy Code, the Debtor is authorized to transfer the Acquired Assets in accordance with the terms of the Purchase Agreement.  The Acquired Assets shall be transferred to Buyer, and upon the Closing, such transfer shall: (a) be valid, legal, binding and effective; (b) vest Buyer with all right, title and interest of the Debtor in the Acquired Assets; and (c) be free and clear of all Claims (including Claims of any governmental authority) in accordance with section 363(f) of the Bankruptcy Code, with all Claims that represent interests in property to attach to the net proceeds of the Sale Transaction, in the same amount and order of their priority, with the same validity, force and effect which they have against the Acquired Assets, and subject to any claims and defenses the Debtor may possess with respect thereto in each case immediately before the Closing.

10.     Except as otherwise provided in the Purchase Agreement, all persons (and their respective successors and assigns) including, without limitation, the Debtor, the Debtor's estate,

all debt security holders, equity security holders, governmental, tax and regulatory authorities, lenders, employees, former employees, pension plans, multiemployer pension plans, trade creditors and any other creditors holding Claims against the Debtor or the Acquired Assets, are hereby forever barred, estopped and permanently enjoined from asserting or pursuing such Claims against Buyer, its affiliates, successors or assigns, its property or the Acquired Assets, including, without limitation, taking any of the following actions with respect to a Claim (other than Assumed Liabilities after the Closing Date): (a) commencing or continuing in any manner any action or other proceeding against Buyer, its affiliates, successors or assigns, assets or properties; (b) enforcing, attaching, collecting or recovering in any manner any judgment, award, decree, or order against Buyer, its affiliates, successors or assigns, assets, or properties; (c) creating, perfecting, or enforcing any Claims against Buyer, its successors or assigns, assets or properties; (d) asserting a Claim as a setoff, right of subrogation or recoupment of any kind against any obligation due Buyer or its successors or assigns; or (e) commencing or continuing any action in any manner or place that does not comply, or is inconsistent, with the provisions of this Sale Order or the agreements or actions contemplated or taken in respect thereof.  No such persons shall assert or pursue against Buyer or its affiliates, successors or assigns any such Claim.

11.    Following the Closing, no holder of any Claim shall interfere with Buyer's title to or use and enjoyment of the Acquired Assets based on or related to any such Claim or based on any actions the Debtor may take in these chapter 11 cases.

12.    Except as expressly set forth in the Purchase Agreement, Buyer and its successors and assigns shall have no liability for any Claim as of the Closing Date, whether derivatively, vicariously, as a transferee or successor or otherwise including Claims arising under, without

limitation: (a) any employment or labor agreements; (b) any pension, welfare, compensation or other employee benefit plans; (c) the Debtor's business operations or the cessation thereof; (d) any litigation involving the Debtor; and (e) any employee, workers' compensation, occupational disease or unemployment or temporary disability related law (i) any environmental laws, rules, or regulations, including, without limitation, under the Comprehensive Environmental Response, Compensation, and Liability Act, 42 U.S.C. §§ 9601, et seq., or similar state statutes, (ii) any bulk sales or similar laws; (iii) any federal, state or local tax statutes, regulations or ordinances and (iv) any common law doctrine of *de facto* merger or successor or transferee liability, successor-in-interest liability theory or any other theory of or related to successor liability.

13.     If any person that has filed financing statements, mortgages, mechanic's liens, *lis pendens* or other documents or agreements evidencing Claims against or in the Debtor or the Acquired Assets shall not have delivered to the Debtor prior to the Closing of the Sale Transactions, in proper form for filing and executed by the appropriate parties, termination statements, instruments of satisfaction, release of all interests which the person has with respect to the Debtor or the Acquired Assets or otherwise, then with regard to the Acquired Assets that are purchased by Buyer pursuant to the Purchase Agreement and this Sale Order (a) the Debtor is hereby authorized and directed to execute and file such statements, instruments, release and other documents on behalf of the person with respect to the Acquired Assets and (b) Buyer is hereby authorized to file, register or otherwise record a certified copy of this Sale Order, which, once filed, registered or otherwise recorded, shall constitute conclusive evidence of the release of all Claims against the Acquired Assets.  This Sale Order is deemed to be in recordable form sufficient to be placed in the filing or recording system of each and every federal, state or local government agency, department or office.

14.     On the Closing Date, this Sale Order shall be considered and constitute for any and all purposes a full and complete general assignment, conveyance and transfer of the Acquired Assets acquired under the Purchase Agreement or a bill of sale or assignment transferring good and marketable title and interest in all of the Acquired Assets to the Buyer.

15.     **No Successor or Other Derivative Liability**.  By virtue of the Sale Transaction, Buyer and its affiliates, successors and assigns, shall not be deemed or considered to: (a) be a legal successor, or otherwise be deemed a successor to the Debtor; (b) have, *de facto* or otherwise, merged with or into the Debtor; or (c) be a continuation or substantial continuation, or be holding itself out as a mere continuation, of the Debtor or its estate, businesses or operations, or any enterprise or operations of the Debtor, in each case by any law or equity, and the Buyer has not assumed nor is it in any way responsible for any liability or obligation of the Debtor or the Debtor's estate, except as expressly set forth in the Purchase Agreement.

16.     **Assumption and Assignment of The Lease**.  The Debtor is hereby authorized in accordance with sections 105(a) and 365 of the Bankruptcy Code to assume and assign the Lease to Buyer free and clear of all Claims, and to execute and deliver to Buyer such documents or other instruments as may be necessary to assign and transfer the Lease to Buyer as provided in the Purchase Agreement.  Upon the Closing, Buyer shall be fully and irrevocably vested with all right, title and interest of the Debtor under the Lease and, pursuant to section 365(k) of the Bankruptcy Code, the Debtor shall be relieved from any further liability with respect to the Lease.  Buyer acknowledges and agrees that from and after the Closing, subject to and in accordance with the Purchase Agreement, it shall comply with the terms of the assumed and assigned Lease in its entirety, including any indemnification obligations expressly contained in

such Lease that could arise as a result of events or omissions that occur from and after the Closing, unless any such provisions are not enforceable pursuant to the terms of this Sale Order.

17.    The Debtor shall pay Madison University Mall LLC a monetary amount as a cure payment (the "Cure") in full satisfaction and cure of any and all defaults and amounts due under the Lease, whether monetary or nonmonetary.  The amount of the Cure shall be $51,559.36, unless Madison University Mall LLC files an objection to the amount of the Cure within thirty (30) days of the entry of this Order, in which case this Court shall conduct a hearing to determine the amount of the Cure. With the exception of the Cure which shall be assertable solely against, and shall be paid solely by, Debtor, each non-debtor party to the Lease is forever barred, estopped and permanently enjoined from asserting against the Debtor or Buyer, their successors or assigns or the property of any of them, any default or amount due under the Lease existing as of the date of the Closing if such default was not raised or asserted prior to or at the Sale Hearing. The Cure shall be paid by the Debtor and not the Buyer.

18.    **Ipso Facto Clauses Ineffective**.  The Lease shall be transferred to, and remain in full force and effect for the benefit of, Buyer in accordance with its respective terms, including all obligations of Buyer as the assignee of the Lease, notwithstanding any provision in the Lease (including, without limitation, those of the type described in sections 365(e)(1) and (f) of the Bankruptcy Code) that prohibits, restricts or conditions such assignment or transfer.  There shall be no rent accelerations, escalations, assignment fees, increases or any other fees charged to Buyer or the Debtor as a result of the assumption or assignment of the Lease.

19.    Upon the Debtor's assignment of Lease to Buyer under the provisions of this Sale Order, no default shall exist under the Lease, and no counterparty to the Lease shall be permitted to declare a default by the Debtor or Buyer otherwise take action against Buyer as a result of any

Debtor's financial condition, bankruptcy or failure to perform any of its obligations under the Lease. Any provision in the Lease that prohibits or conditions the assignment or sublease of the Lease (including without limitation, the granting of a lien therein) or allows the counterparty thereto to terminate, recapture, impose any penalty, condition on renewal or extension, or modify any term or condition upon such assignment or sublease, constitutes an unenforceable anti-assignment provision that is void and of no force and effect. The failure of the Debtor or Buyer to enforce at any time one or more terms or conditions of the Lease shall not be a waiver of such terms or conditions, or of the Debtor's and Buyer's rights to enforce every term and condition of the Lease.

20.    **Statutory Mootness**.  The Sale Transaction contemplated by the Purchase Agreement is undertaken by Buyer in good faith, as that term is used in section 363(m) of the Bankruptcy Code, and accordingly, the reversal or modification on appeal of the authorization provided herein of the Sale Transaction shall neither affect the validity of the Sale Transaction nor the transfer of the Acquired Assets to Buyer, free and clear of Claims, unless such authorization is duly stayed before the Closing pending such appeal.

21.    **No Avoidance of Purchase Agreement**.  Neither the Debtor nor Buyer has engaged in any conduct that would cause or permit the Purchase Agreement to be avoided or costs and damages to be imposed under section 363(n) of the Bankruptcy Code. Accordingly, the Purchase Agreement and the Sale Transaction shall not be avoidable under section 363(n) of the Bankruptcy Code, and no party shall be entitled to any damages or other recovery pursuant to section 363(n) of the Bankruptcy Code in respect of the Purchase Agreement or the Sale Transaction.

22.    **Waiver of Bankruptcy Rules 6004(h) and 6006(d)**.  Notwithstanding the provisions of Bankruptcy Rules 6004(h) and 6006(d) or any applicable provisions of the Local Rules, this Sale Order shall not be stayed after the entry hereof, but shall be effective and enforceable immediately upon entry, and the fourteen (14) day stay provided in Bankruptcy Rules 6004(h) and 6006(d) is hereby expressly waived and shall not apply.  Any party objecting to this Sale Order must exercise due diligence in filing an appeal and pursuing a stay within the time prescribed by law and prior to the Closing, or risk its appeal will be foreclosed as moot.

23.    **Binding Effect of Sale Order**.  The terms and provisions of the Purchase Agreement and this Sale Order shall be binding in all respects upon, or shall inure to the benefit of, the Debtor, its estate and creditors, Buyer, and their respective affiliates, successors and assigns, and any affected third parties, including all persons asserting Claims, notwithstanding any subsequent appointment of any trustee, examiner or receiver under any chapter of the Bankruptcy Code or any other law, and all such provisions and terms shall likewise be binding on such trustee, examiner or receiver and shall not be subject to rejection or avoidance by the Debtor, its estate, creditors or any trustee, examiner or receiver.

24.    **Conflicts; Precedence**.  In the event that there is a direct conflict between the terms of this Sale Order and the terms of (a) the Purchase Agreement, or (b) any other order of this Court, the terms of this Sale Order shall control.  Nothing contained in any chapter 11 plan hereinafter confirmed in these chapter 11 cases, or any order confirming such plan, shall conflict with or derogate from the provisions of the Purchase Agreement or the terms of this Sale Order.

25.    **Modification of Purchase Agreement.**  The Purchase Agreement, and any related agreements, documents or other instruments, may be modified, amended or supplemented by the parties thereto, in a writing signed by each party, and in accordance with the terms

19

thereof, without further order of the Court; <u>provided</u> that any such modification, amendment or supplement does not materially change the terms of the Purchase Agreement or any related agreements, documents or other instruments.

26.     **Bulk Sales**.  No bulk sales law or similar law of any state or other jurisdiction shall apply in any way to the transactions contemplated by the Purchase Agreement, the Sale Motion or this Sale Order.

27.     **Retention of Jurisdiction**.  This Court shall retain exclusive jurisdiction to, among other things, interpret, enforce and implement the terms and provisions of this Sale Order and the Purchase Agreement, all amendments thereto, any waivers and consents thereunder (and of each of the agreements executed in connection therewith), to adjudicate disputes related to this Sale Order or the Purchase Agreement (and such other related agreements, documents or other instruments) and to enforce the injunctions set forth herein.

28.     **Distribution of Proceeds.** The net sale proceeds from the sale of the Sale Assets shall be disbursed at closing in the following manner:

a.      Payment of $280,000.00, to Three-Twenty One Capital Partners, LLC for payment in full of all compensation and reimbursement of expenses.

b.      Then, payment of a total of $73,000.00 to FreshPoint North Carolina, Inc. and to Limehouse Produce Co., Inc., in full and final satisfaction of their allowed PACA trust claims. Payment shall be made payable to the "McCarron & Diess Client Trust Account."   FreshPoint North Carolina, Inc. and Limehouse Produce Co., Inc. reserve all rights with respect to any non-PACA administrative or general unsecured claims.

c.      Then, payment of $282,000.00 to SummitBridge's in payment in full of its post-petition indebtedness under the Interim Order Granting Authority to Obtain Post-Petition

Financing From SummitBridge National Investments IV, LLC [Docket No. 155], and SummitBridge waives all interest and attorneys' fees related thereto.

d.    Then, $400,000 to be held in the trust account of counsel for the Debtor, to be available for the payment of Permitted Trailing Expenses, excluding professional fees, that accrued on or before August 22, 2016. As used herein, the term "Permitted Trailing Expenses" shall mean the following expenses to the extent incurred post-petition and on or prior to August 22, 2016, but in the aggregate amount not to exceed one hundred fifteen percent (115%) of the aggregate expenditures set forth in the Budget attached to Docket No. 116 through August 22, 2016: (i) the costs of operating and preserving the estate from the Petition Date through August 22, 2016; and (ii) quarterly fees pursuant to 28 U.S.C. § 1930(a)(7).  These specifically include, and the Debtor is authorized to immediately disburse, (i) the Cure payment to Madison University Mall, LLC; (ii) the amount necessary to pay in full all unpaid accrued payroll and payroll-related obligations for the time period of August 8, 2016, through August 22, 2016, which amount is approximately $290,000; and (iii) quarterly fees pursuant to 28 U.S.C. § 1930(a)(7) for the third quarter of 2016.

e.    The sum of $125,000, to be held in the trust account of counsel for the Debtor, to be available for payment of the reasonable and Court approved professional fees, accrued on or after the Petition Date, of the Debtor's counsel and the Debtor's CRO.  All right to assert additional claims for professional fees from the Debtor, the Debtor's CRO, any subsequently appointed trustee, or the Committee, pursuant to Section 506(c) of the Bankruptcy Code are permanently waived.   This provision is not intended to limit or

preclude Silk Route from asserting a claim for attorney's fees against the Debtor's bankruptcy estate, or any party in interest's right to object to the same.

f.      The sum of $2,340,000 to SummitBridge on account of its secured pre-petition indebtedness.

29.     **Committee Carve-Out.**  SummitBridge consents to allow the Committee to initiate and conduct a sale certain Excluded Assets consisting of (i) any of the equipment or machinery, but not inventory, that was previously located at the Seller's stores in Richmond, VA or Mount Pleasant, SC, and is currently located in the Seller's distribution center, (ii) all tangible assets, except for inventory, located at the Seller's stores in Raleigh, NC and Asheville, NC, (iii) all fixed assets listed under the column Distribution Center on the Valuation Fixed Assets page of Exhibit A to the Purchase Agreement, with an original book value of $234,883, (iv) all automobiles under the  Distribution Center column on the "Automobile" row on the Valuation Fixed Assets page of Exhibit A to the Purchase Agreement, and (vii)  all tangible assets located at the Seller's stores in Mount Pleasant, SC and Charleston, SC. (collectively, the "Carve-Out Assets"), and will cooperate with the Committee in this liquidation sale process.  The Committee is granted the standing and authority to seek appropriate Court authority to conduct the anticipated sales. Sale proceeds from the Carve-Out Assets shall be distributed as follows:

a.      Sale Expenses: All sale expenses shall be paid as a first priority from sale proceeds and shall include all expenses associated with the sale of the Carve-Out Assets which include actual attorney time to authorize and approve the sale, auctioneer expenses for setup, marketing sale, post-sale transfer activities for sold equipment and all commission and buyer premiums involved with said sale, any allowed 11 U.S.C. § 503 administrative expenses for rent associated with storage of Carve-Out Assets pending

sale. It is contemplated the allowed auctioneer or other liquidation expenses will be pre-approved by the Bankruptcy Court.

b.        The first $50,000 after the payment of Sale Expenses shall be paid to counsel for the Committee for a direct distribution to unsecured creditors from the collateral of SummitBridge (the "$50,000 Payment"). These funds shall reduce SummitBridge's secured claim dollar for dollar and shall be held directly for the benefit of allowed general unsecured creditors for either distribution on their allowed claims or payment of allowed administrative expenses incurred directly for the benefit of unsecured claims. Expenses for the benefit of unsecured claims would include, but not be limited to, expenses in the nature of, attorney fees, expenses owed and unpaid to the attorney for the unsecured creditor committee, attorney fees, commission and expenses and special counsel fees (11 U.S.C. § 327(e)) incurred by any Chapter 7 Trustee, if such a Trustee was to be appointed.

c.        After the payment of Sale Expenses and the $50,000 Payment, the payment of any remaining unpaid Permitted Trailing Expenses, which amount shall further reduce SummitBridge's secured claim dollar for dollar.  The Debtor shall seek advance approval from SummitBridge for the payment of any Permitted Trailing Expense and shall provide detailed information to SummitBridge as reasonably requested by SummitBridge to justify any payment.  SummitBridge shall respond to any such request within three (3) business days.  If SummitBridge consents to the payment of a Permitted Trailing Expense, Debtor shall be permitted to make the payment without further application to the Court.  If there is a dispute as to the amount or propriety of a Permitted Trailing Expense, Debtor shall file a motion with the Court for the Court to resolve the dispute.

23

d.    The next $200,000 (the "$200,000 Payment") to the Unsecured Creditors' Committee for a direct distribution to unsecured creditors from the collateral of SummitBridge, which shall further reduce SummitBridge's secured claim dollar for dollar.  The $200,000.00 payment shall be held directly for the benefit of allowed general unsecured claims, for either distribution on their allowed claims, or payment of allowed administrative expenses incurred directly for the benefit of unsecured claims.

e.    After the payment of Sale Expenses, the $50,000 Payment, the payment of any remaining Permitted Trailing Expenses, and the $200,000 Payment, fifty percent (50%) of any remaining sale proceeds shall be paid to counsel for the Committee for a direct distribution to unsecured claims, which shall further reduce SummitBridge's secured claim dollar for dollar, and the other fifty percent (50%) of the remaining sale proceeds shall be paid to SummitBridge towards its secured claim.

30.    **Release of SummitBridge.**  Effective immediately upon entry of this Order, the Committee and Debtor and each of the Committee and Debtor's respective agents, affiliates, subsidiaries, directors, officers and representatives absolutely, unconditionally and irrevocably waive, discharge and release SummitBridge and each of SummitBridge's respective members, agents, affiliates, subsidiaries, directors, officers, employees, attorneys, professionals and representatives (collectively with SummitBridge the "SummitBridge Parties") of and from any and all claims, counterclaims, actions, debts, accounts, interests, obligations, rights, suits, damages, causes of action (including, without limitation, causes of action in the nature of "lender liability"), defenses, setoff rights, remedies and liabilities whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereafter arising, in law, equity or otherwise, that the Debtor, its Estate or the Committee have or may have against the SummitBridge Parties

24

which arise out of or in any way relate to, directly or indirectly, SummitBridge Parties' and Debtor's prepetition and/or post-petition relationship, and/or any pre or post-petition act, omission, event or transaction of the SummitBridge Parties whether accrued or not including, without limitation, (i) any re-characterization, subordination, avoidance or other claim arising under or pursuant to section 105 or chapter 5 of the Bankruptcy Code or under any other similar provisions of applicable law, including state law, federal law, municipal law or foreign law; (ii) any right or basis to challenge or object to the amount, validity or enforceability of SummitBridge's prepetition debt or liens or any payments made on account of prepetition debt; (iii) any right or basis to challenge or object to the amount, validity or enforceability of SummitBridge's postpetition liens or any payments made on account of postpetition loans; (iv) any claims or causes of action under sections 502(d), 544, 545, 546, 547, 548, 549, 550 or 553 of the Bankruptcy Code and any other avoidance actions under the Bankruptcy Code and the proceeds thereof and property received thereby whether by judgment, settlement, or otherwise; (v) any action based on piercing the corporate veil, aiding and abetting, alter ego, successor liability or similar claim; and (vi) commercial tort claims.

[END OF DOCUMENT]

**Exhibit A**

**Purchase Agreement**

## ASSET PURCHASE AGREEMENT

THIS ASSET PURCHASE AGREEMENT (together with the exhibits and schedules hereto, this "Agreement"), is made as of this 17th day of August, 2016, by and between Calvert Retail, LP (the "Purchaser"), and Southern Season, Inc. (the "Seller").

## W I T N E S S E T H

WHEREAS, Seller has filed a voluntary petition with the United States Bankruptcy Court for the Middle District of North Carolina (the "Bankruptcy Court") for relief under Chapter 11, title 11, United States Code, 11 U.S.C. §§ 101, *et seq.* (the "Bankruptcy Code"); and

WHEREAS, Purchaser desires to purchase from Seller, and Seller desires to sell to Purchaser, substantially all of Seller's assets, free and clear of all claims, liens or interests, upon the terms and conditions set forth herein.

WHEREAS, the Purchase Price payable by Purchaser is based upon the information contained in that certain Solicitation of Bids for: Southern Season prepared by Three Twenty-One Capital Partners (the "Banker") attached hereto as Exhibit A.

NOW, THEREFORE, for and in consideration of the representations, warranties, covenants and agreements contained herein and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto, intending to be legally bound, agree as follows:

## ARTICLE 1

As used herein, the following terms shall have the following meanings:

"*Auction*" means an auction of the Sale Assets conducted in accordance with the Sale Procedures Order.

"*Bankruptcy Case*" means Seller's case commenced under Chapter 11 of the Bankruptcy Code in the Bankruptcy Court, Case No. 16-80558.

"*Bankruptcy Petition*" means the voluntary bankruptcy petition filed by Seller with the Bankruptcy Court.

"*Business Day*" means any day that is not a Saturday, Sunday, or other day on which banks are required or authorized by law to be closed in New York, New York.

"*Closing Date*" has the meaning set forth in Section 4.1.

"*Knowledge*" of an individual means the actual knowledge of such individual. With respect to a Person (other than an individual), "Knowledge" means the actual knowledge of any individual who is serving as a director or executive officer (or in any similar capacity) of such Person.

"*Lien*" means any lien, security interest, pledge, hypothecation, encumbrance or other interest or claim (including, but not limited to, any and all "claims," as defined in Section 101(5) of the Bankruptcy Code, and any and all rights and claims under any bulk transfer statutes and similar laws) in or with respect to any of the Sale Assets (including, but not limited to, any options or rights to purchase such Sale Assets and any mechanics' or tax liens), whether arising by agreement, by statute or otherwise and whether arising prior to, on or after the date of the filing of the Bankruptcy Petition.

"*Material Adverse Effect*" means the occurrence or failure of an event that could reasonably be expected to have a material adverse effect on the value of the Sale Assets, taken as a whole.

"*Person*" means any individual, corporation, partnership, joint venture, trust, association, limited liability company, unincorporated organization, other entity, or governmental body or subdivision, agency, commission or authority thereof.

"*Petition Date*" means June 24, 2016, the date on which Seller filed the Bankruptcy Petition under Chapter 11 of the Bankruptcy Code.

"*Purchase Price*" has the meaning set forth in Section 3.1.

"*Purchaser Affiliate*" means an entity created by Purchaser or an owner of Purchaser to purchase and own the assets transferred by Seller under this Agreement.

"*Purchaser Default Termination*" has the meaning set forth in Section 3.2.1.1.

"*Registered IP*" means all registered intellectual property (including applications) of the Seller, including, without limitation, USPTO registrations for "A SOUTHERN SEASON, Reg. No. 1683106" and "SOUTHERN SEASON, Reg. No. 4457919" as well as the the following registered trademarks: WINE BUY.COM (online beer and wine sales); SOUTHERLY (restaurant); and SOUTHERLY RESTAURANT AND PATIO (restaurant).

"*Sale Assets*" has the meaning set forth in Section 2.1.

"*Sale Motion*" means the Motion, in form and substance reasonably acceptable to Purchaser, to (A) Approve Sale Of Substantially All Assets, (B) Establish Related Sale Procedures, (C) Transfer Any and All Claims, Liens, Encumbrances And Interests In Sale Assets To Proceeds of Sale, (D) Approve Form And Manner Of Notice Of Sale, (E) Assume and Assign Certain Real Property Leases, and (F) Schedule Hearings, dated August 12, 2016, filed in the Bankruptcy Case as Docket No. 163.

"*Sale Procedures Order*" means the Order Approving (A) Form And Manner of Notice and Sale Procedures for the Seller's Assets, (B) Setting Deadlines For Bids And Objections, And (C) Scheduling Auction And Sale Hearing, to be entered in the Bankruptcy Case.

2

"*Sale Procedures*" means the sale procedures, reasonably acceptable to Purchaser, set forth in the Sale Procedures Order.

"*Sale Order*" means the entry of an Order of the Bankruptcy Court, in substantially the form attached hereto as Exhibit B, approving the transactions contemplated hereby and the definitive documentation and waiving the fourteen (14) day automatic stay of Bankruptcy Rule 6004(h), which Sale Order has not been stayed pending appeal.

## ARTICLE 2

**2.1**    <u>Sale and Purchase of Assets</u>.  Upon the terms and subject to the satisfaction of the conditions contained in this Agreement, at the Closing, Seller shall sell, assign, convey, transfer and deliver to Purchaser and or a Purchaser Affiliate (in Purchaser's sole discretion), and Purchaser and or a Purchaser Affiliate (in Purchaser's sole discretion) shall, by Purchaser's payment of the Purchase Price, purchase and acquire from Seller, all of Seller's right, title and interest, free and clear of all Liens, in and to all of the Seller's (i) inventory whether on location, in transit or in storage off-site, including off-site at the Seller's distribution center, and supplies and materials used in connection with the operation of the business, (ii) equipment, machinery, smallwares, instruments, furniture, fixtures, leasehold improvements and all other tangible property, including any furniture, fixtures, removable leasehold improvements, equipment and machinery located off-site or at the Seller's distribution center (including smallwares formerly located in the Mt. Pleasant store or restaurant, (iii) prepaid expenses, credit card processing reserves and security deposits, (iv) accounts receivable, (v) proprietary information, intellectual property, trade secrets and confidential information, technical information and data, trademarks, trade names, and service marks, including but not limited to the "A Southern Season" (and any versions, derivatives or similar variations) name and logo, any other logos, symbols, emblems, insignia or similar names and or any other related service marks or marks, including but not limited to any name or mark or logo confusingly similar thereto, and the rights to any claims and causes of action of the Seller with respect to any of such intellectual property rights, and including without limitation all Registered IP, (vi) machinery and equipment warranties and service contracts and any other covenants, representations, warranties and contractual rights and indemnification, including any confidentiality agreements, related to any of the purchased assets or the Assumed Liabilities or Assumed Lease, (vii) all other documentation related to the operation of the Store, including all licenses and permits necessary to the operation (including, without limitation, liquor licenses and permits), (viii) all books and records related to the Sale Assets and the operation of the Seller's stores, including all financial, accounting and property tax records, computer data and programs, market data, research, marketing, promotional and sales materials, customer lists, and records and all correspondence with and documents pertaining to suppliers, governmental authorities and other third parties, and any rights belonging to the Seller related to contract bids in process, (ix) the Seller's e-commerce online store and platform, to include www.SouthernSeason.com, the Holiday Season print magazine and telephone call center, and associated goodwill and IP and all telephone numbers and email addresses, and (x) all automobiles under the Charleston and Richmond columns on the "Automobile" row on the Valuation-Fixed Assets page of Exhibit A, and (xi) all other assets, tangible and intangible, used in or generated in connection with, the operation of the stores and not specifically excluded under Section 2.2 (the "Sale Assets").  The Sale Assets shall be sold "as is, where is," without any representation as to warranty or fitness, subject to wear and tear,

3

and free and clear of all Liens to the fullest extent permitted under Section 363 of the Bankruptcy Code.

2.2  Excluded Assets.  Notwithstanding any provision herein to the contrary, the Sale Assets shall not include (i) the Seller's cash, cash equivalents, bank deposits, funds in transit or tax refunds, but excluding from such assets, any security deposits held by landlords in connection with any Assumed Liabilities or Assumed Lease, (ii) any causes of action that are pending or may be brought by or on behalf of the Seller, including those that may be brought by the Seller pursuant to Chapter 5 of the Bankruptcy Code, (iii) security deposit(s) with respect to any lease(s) not assumed by the Purchaser at Closing, (iv) any of the equipment or machinery, and in all cases such exclusion shall not apply to any inventory, where such equipment or machinery was previously located at the Seller's stores in Richmond, VA or Mount Pleasant, SC, and is currently located in the Seller's distribution center, (v) all tangible assets, except for inventory, located at the Seller's stores in Raleigh, NC and Asheville, NC,or (vi) all fixed assets listed under the column Distribution Center on the Valuation-Fixed Assets page of Exhibit A, with an original book value of $234,883), (vi) all automobiles under the  Distribution Center column on the "Automobile" row on the Valuation-Fixed Assets page of Exhibit A, and (vii)  all tangible assets located at the Seller's stores in Mount Pleasant, SC and Charleston, SC (collectively, the "Excluded Assets").

2.3  Assumed Liabilities.  Purchaser shall not assume any liabilities or obligations of Seller (including, without limitation, with respect to any gift cards, premier cards, or discount cards issued by Seller or its affiliates), except as expressly provided herein.  Upon the terms and subject to the conditions of this Agreement, effective as of the close of business on the Closing Date, the Purchaser agrees to assume, pay, perform and discharge, promptly when payment or performance is due or required, subject to any defenses or claimed offsets asserted in good faith against the obligee to whom such liabilities of the Seller are owed:  those liabilities or obligations of the Seller arising and accruing under the Assumed Lease after Closing, excluding (1) any cure costs necessary in connection with the assumption and assignment of the Assumed Lease, which cure costs shall be paid for by Seller out of the Purchase Price, and (2) liabilities related to tort or violation of applicable law prior to Closing (the "Assumed Liabilities").

2.4  Assumed Lease.  The Seller shall assume and assign to Purchaser at Closing the real property leases with respect to the following premises:  (i) the Southern Season Store and Weathervane Restaurant at 201 S.  Estes Drive, Chapel Hill, NC  27514, (the "Assumed Lease").

2.5  Executory Contracts.  The Seller shall pay at Closing all cure costs necessary in connection with the assumption and assignment of the Assumed Lease (the "Assumed Lease Cure Costs").  Within thirty (30) days of the Closing, Purchaser shall notify Seller which of Seller's leases of personal property or any other executory contracts, in addition to the Assumed Lease, that it desires to assume from Seller; provided, however, that in connection with any such assumption, Purchaser shall be responsible for any and all cure costs associated with any such lease or contract designated. Seller shall promptly file a motion or motions seeking an order from the Bankruptcy Court authorizing such assumption in accordance with the terms and conditions of this Agreement, and the Purchaser shall reimburse the Seller for the reasonable attorney's fees and costs in connection with the preparation of such motion and order, and the preparation for and attendance at any necessary hearing.  The Purchaser has no interest in assuming the leases

4

for the real property with respect to the Seller's stores in Raleigh, NC, Asheville, NC, or Charleston, SC, or the Seller's distribution center, and Seller may reject such leases at any time.

2.6 <u>Varilease Agreement</u>.  Seller and Purchaser contemplate and agree that the certain agreement between Varilease Finance, Inc. and A Southern Seasons, Inc. dated April 19, 2012, and any amendments, extensions or supplements thereto (collectively, the "Varilease Agreement"), is a lease covered by the provisions of Section 2.5 above.  Subject to the provisions of Section 2.5, if the Varilease Agreement is assumed and assigned to Purchaser, Purchaser shall pay any cure costs necessary in connection with the assumption and assignment of the Varilease Agreement.  Notwithstanding any provision herein to the contrary, if (i) it is determined that the Varilease Agreement is not a true lease and the interest of Varilease Finance, Inc. is a disguised security interest, and (ii) Purchaser desires to acquire the equipment provided pursuant to the Varilease Agreement, the Purchaser would be responsible for any payment necessary in order to release the lien of Varilease Finance, Inc.

2.7    <u>Further Assurances</u>.  Seller covenants and agrees to use its reasonable efforts to assist Purchaser, at Purchaser's sole cost and expense, in (i) transitioning the Sale Assets to Purchaser's ownership, and (ii) facilitating Purchaser's business operations with respect to the Sale Assets following Closing, including, without limitation, with respect to all liquor license transfer/application and similar issues.

## <u>ARTICLE 3</u>

3.1 <u>Purchase Price</u>.  In consideration for the Sale Assets, and subject to the other terms and conditions of this Agreement, and the entry and effectiveness of the Sale Order, Purchaser shall pay to Seller an amount in cash equal to $3,500,000.00 (the "Purchase Price"), which amount may be increased if the Purchaser so elects at any Auction held pursuant to the Sale Procedures.  The Purchase Price, less the Deposit (as defined below), shall be paid by Purchaser to Seller on the Closing Date by wire transfer of immediately available U.S. funds to Seller's counsel prior to the Closing.

3.2 <u>Deposit</u>.  Prior to  the execution of this Agreement, Purchaser has deposited the sum of $100,000 (the "Deposit") in the form of a wire transfer to the Banker, which shall be held in a non-interest bearing trust account by the Banker pending the completion of the Auction.  The Deposit shall be held as a trust fund and shall not be subject to any lien, attachment, or any other judicial process of any creditor of Seller or Purchaser.

3.2.1.1 The Deposit shall become payable to Seller upon the earlier of: (a) the Closing; or (b) the termination of this Agreement pursuant to Section 11.1.4 for failure of the condition precedent set forth in Section 10.1.1 (a "Purchaser Default Termination").  At the Closing, the Deposit shall be delivered to Seller and credited toward payment of the Purchase Price.

3.2.1.2 In the event the Deposit becomes payable to Seller by reason of a Purchaser Default Termination, Seller and Purchaser shall within one Business Day of such event, instruct the Banker to, and the Banker shall, within two Business Days after such instruction or upon entry of a Final Order to such effect by the Bankruptcy Court, disburse the Deposit to Seller to be retained by Seller for its own account.  Any such Deposit payment shall

constitute an agreed-upon payment for liquidated damages arising out of such Purchaser Default Termination, and not a penalty.

   3.2.1.3  If this Agreement or the transactions contemplated herein are terminated other than a termination which constitutes a Purchaser Default Termination, Seller and Purchaser shall, within one Business Day of such event, instruct the Banker to, and the Banker shall, within two Business Days after such instruction or upon entry of a Final Order to such effect by the Bankruptcy Court, return the Deposit to Purchaser.

## ARTICLE 4

  4.1  <u>Closing</u>.  The closing of the transaction contemplated hereby will take place (the "Closing" or "Closing Date") by no later than August 22, 2016.  The Closing will take place at a location to be mutually agreed upon by Purchaser and Seller.  The transfer of the Sale Assets shall be effective for all purposes as of 12:01 a.m. eastern time on the day following the Closing Date.

  4.2  <u>Court Approval Required</u>.  Seller and Purchaser acknowledge and agree that the Bankruptcy Court's entry of the Sale Order is required in order for Seller and Purchaser to consummate the transactions contemplated hereby and that the requirement that the Sale Order be entered is a condition that cannot be waived by any party hereto.

## ARTICLE 5

  5.1  <u>Deliveries by Seller</u>.  At the Closing, Seller shall deliver or cause to be delivered to Purchaser the following (each in form and substance reasonably satisfactory to Purchaser):

   5.1.1  A duly executed bill of sale, dated the Closing Date, transferring to Purchaser all right, title and interest in and to the Sale Assets free and clear of all Liens, without exception or condition.

   5.1.2  A duly executed assignment, dated the Closing Date, assigning the Assumed Lease to the Purchaser.

   5.1.3  A certified copy of the Sale Order.

   5.1.4  Such other instruments or documents or certificates or affidavits that may be required by any local, state or federal taxing or other authority, as Purchaser may reasonably request to fully effect the transfer of the Sale Assets and to confer upon Purchaser the benefits contemplated by this Agreement, and any transfer agreements with any local, state or federal authority or agency, including the United States Patent and Trademark Office, necessary to perfect title to any of the Sale Assets in Purchaser.

  5.2  <u>Deliveries by Purchaser</u>.  At the Closing, Purchaser shall deliver, or cause to be delivered, the following:

   5.2.1  The Purchase Price.

5.2.2 Such other instruments or documents as Seller may reasonably request to fully effect the transfer of the Sale Assets and to otherwise consummate the transactions contemplated by this Agreement.

## ARTICLE 6

6.1 <u>Representations And Warranties Of Purchaser</u>.  Purchaser hereby represents and warrants to Seller that the statements contained in this Article are correct and complete as of the date hereof and as of the Closing Date:

6.1.1 Purchaser is a legal entity duly organized, validly existing and in good standing under the laws of the State of Delaware.

6.1.2 The execution, delivery and performance of this Agreement by Purchaser and the consummation of the transactions contemplated hereby have been duly authorized by the general partner or other governing body of Purchaser and, subject to and conditioned upon the entry of the Sale Order, no other act or proceeding on the part of Purchaser is necessary to approve the execution and delivery of this Agreement, the performance by Purchaser of its obligations hereunder or the consummation of the transactions contemplated hereby.  This Agreement has been duly and validly executed and delivered by Purchaser and constitutes a legal, valid and binding obligation of Purchaser, enforceable in accordance with its terms.

6.1.3 The execution, delivery and performance by Purchaser of this Agreement and the consummation of the transactions contemplated hereby will not: (i) with or without the giving of notice or the lapse of time, or both, conflict with, or result in the breach of or constitute a default under, or result in the modification, cancellation, lapse or termination of, or limitation, or curtailment under, or violate any (a) provision of law, or (b) any agreement, contract, lease, power of attorney, commitment, instrument, insurance policy, arrangement, undertaking, order, decree, ruling or injunction to which Purchaser is subject or a party or by which it is bound (or with respect to which its properties or assets are subject or bound); or (ii) violate the certificate of limited partnership or partnership agreement of Purchaser.

6.1.4 Except for the Sale Order, no consent, notice, authorization or approval of, or exemption by, any governmental or public body or authority or by any other Person, whether pursuant to contract or otherwise, is required to be obtained by Purchaser in connection with the execution, delivery and performance of this Agreement or any of the instruments or agreements herein referred to or the taking of any action herein or therein contemplated.

6.1.5 Purchaser has cash available or has existing borrowing facilities or unconditional, binding funding commitments that are sufficient to enable it to timely consummate the transactions contemplated by this Agreement.

6.1.6 Purchaser has not taken any action that would cause Seller to have any obligation or liability to any Person for finders' fees, brokerage fees, agents'

7

commissions or like payments in connection with the execution and delivery of this Agreement or the consummation of the transactions contemplated hereby.

## ARTICLE 7

7.1  Representations And Warranties Of Seller.  Seller hereby represents and warrants to Purchaser that the statements contained in this Article are correct and complete as of the date hereof and as of the Closing Date:

7.1.1  Seller is a legal entity duly organized, validly existing and in good standing under the laws of the State of North Carolina.

7.1.2  The execution, delivery and performance of this Agreement by Seller and the consummation of the transactions contemplated hereby have been duly authorized by John Fioretti, the court-appointed Chief Restructuring Officer of Seller and, subject to and conditioned upon the entry and effectiveness of the Sale Order, no other act or proceeding on the part of Seller is necessary to approve the execution and delivery of this Agreement, the performance by Seller of their obligations hereunder or the consummation of the transactions contemplated hereby.  This Agreement has been duly and validly executed and delivered by Seller and, subject to and conditioned upon the entry and effectiveness of the Sale Order, constitutes a legal, valid and binding obligation of Seller, enforceable in accordance with its terms.

7.1.3  Seller has, and at the Closing shall convey to Purchaser, good, valid and marketable title to the Sale Assets, free and clear of all Liens to the extent provided in the Sale Order.

7.1.4  Except to the extent excused by or unenforceable as a result of the filing of the Bankruptcy Petition and except for the entry and effectiveness of the Sale Order, the execution, delivery and performance by Seller of this Agreement and the consummation of the transactions contemplated hereby will not:  (i) with or without the giving of notice or the lapse of time, or both, conflict with, or result in the breach of or constitute a default under, or result in the modification, cancellation, lapse or termination of, or limitation, or curtailment under, or violate any (a) provision of law, or (b) any agreement, contract, lease, power of attorney, commitment, instrument, insurance policy, arrangement, undertaking, order, decree, ruling or injunction to which Seller is subject or a party or by which it is bound (or with respect to which its properties or assets are subject or bound); or (ii) violate the articles of incorporation or bylaws of Seller.

7.1.5  Except for the Sale Order, no consent, notice, authorization or approval of, or exemption by, any governmental or public body or authority, or by any other Person, whether pursuant to contract or otherwise, is required in connection with the execution, delivery and performance of this Agreement or any of the instruments or agreements herein referred to or the taking of any action herein or therein contemplated.

7.1.6  Seller has not taken any action that would cause Purchaser to have any obligation or liability to any Person for finders' fees, brokerage fees, agents'

commissions or like payments in connection with the execution and delivery of this Agreement or the consummation of the transactions contemplated hereby.

7.2 <u>No Other Representations or Warranties</u>.  Except as expressly set forth herein, Seller makes no representation or warranty, express or implied, at law or in equity, with respect to Seller and the Sale Assets or any other information provided to Purchaser, its agents or representatives in connection with or in expectation of the transactions contemplated by this Agreement.  Seller does not make any representations or warranties regarding information, documents, projections, forecasts or other material made available to Purchaser, its agents or representatives in connection with or in expectation of the transactions contemplated in this Agreement except to the extent such information is expressly and specifically included in a representation or warranty contained in this Article 7.

## <u>ARTICLE 8</u>

8.1 <u>Submission for Bankruptcy Court Approval</u>.

8.1.1  After the Auction, Seller shall seek, among other things and subject to the Sale Procedures approved by the Bankruptcy Court:  (i) the Bankruptcy Court's approval of this Agreement, and Seller's performance under this Agreement; and (ii) the entry of the Sale Order.  Purchaser shall take such actions as are reasonably requested by Seller to assist Seller in obtaining a finding by the Bankruptcy Court that Purchaser is deemed to have purchased the Sale Assets in good faith pursuant to section 363(m) of the Bankruptcy Code.

8.1.2  If the Sale Order or any other orders of the Bankruptcy Court relating to this Agreement or the transactions contemplated hereby shall be appealed by any Person (or if any petition for certiorari or motion for reconsideration, amendment, clarification, modification, vacation, stay, rehearing or reargument shall be filed with respect to the Sale Order or other such order), subject to rights otherwise arising from this Agreement, Seller and Purchaser shall use their commercially reasonable efforts to prosecute such appeal, petition or motion and obtain an expedited resolution of any such appeal, petition or motion, at no cost to Purchaser. For the avoidance of doubt, this provision shall not be construed as creating an obligation of the Seller to pay the Purchaser's attorney's fees, costs, other expenses in connection with any such appeal, petition or motion.

8.2 <u>Governmental Authority and Approvals</u>.  Prior to the Closing, each of Seller and Purchaser shall use its commercially reasonable efforts to make any filings and notifications, and to obtain any consents from governmental authorities, required to be made and obtained under applicable legal requirements in connection with the transactions contemplated by this Agreement as promptly as practicable.

8.3 <u>Transaction Expenses</u>.  Except as expressly provided for herein, each party shall pay all fees, costs and expenses incurred by it with respect to this Agreement, whether or not the transactions contemplated hereby are consummated, except for the Purchaser's ability to seek a

break-up fee in the amount of $150,000, only to the extent approved by the Bankruptcy Court, under certain circumstances as provided in the Sale Procedures.

8.4 <u>Further Assurances</u>.  Purchaser and Seller shall, from time-to-time after the Closing, without further consideration, execute and deliver such instruments and take such further actions as may be reasonably necessary or desirable to carry out the provisions hereof and the transactions contemplated hereby.

8.5 <u>Payment of Certain Taxes</u>.  Unless exempt under Section 1146(c) of the Bankruptcy Code, Purchaser shall pay any and all sales, transfer or transaction taxes imposed by any taxing authority, including, without limitation, any state, county, municipality or other subdivision thereof, in connection with the consummation of the transactions contemplated by this Agreement.

8.6 <u>Conduct of Business</u>.  From the date of this Agreement until the Closing Date, except as required by the Bankruptcy Code or with the prior written consent of Purchaser, Seller shall conduct the business of Seller in the ordinary course of business and in compliance in all material respects with all applicable laws and orders of the Bankruptcy Court, including maintaining the same policies and procedures with respect to accounts receivable, payments of accounts payable and procurement and maintenance of inventory.  Seller shall use commercially reasonable efforts, under the circumstances, to preserve substantially intact the business organization of the business of the Seller, to keep available the services of the current officers, employees, consultants and independent contractors of the Seller and to preserve the relationship of the Seller with its customers and suppliers and others having business relationships with the Seller.  For the avoidance of doubt, nothing herein shall preclude the Seller from conducting a store- closing sale with respect to its store located in Charleston, SC, either prior to the Closing Date or within 30 days after the Closing Date.

8.7 <u>Actions Required</u>.  From the date of this Agreement until the Closing Date, Seller shall use commercially reasonable efforts to obtain all consents to the extent required by the operation of Section 365 of the Bankruptcy Code for the assumption and assignment to Purchaser of the Assumed Liabilities in accordance with this Agreement.

8.8 <u>Notifications</u>.  From the date of this Agreement until the earlier of the Closing or the termination of this Agreement pursuant to Article 11, Seller shall give Purchaser prompt written notice of the occurrence of any of the following events, to the extent that such events reasonably could be expected to have a Material Adverse Effect:

8.8.1  Any loss, taking, condemnation, damage or destruction of or to any of the Sale Assets.

8.8.2  The commencement of any proceeding or litigation at law or in equity or any other commission, agency or administrative or regulatory body or authority against Seller affecting the Sale Assets.

8.8.3  Any other materially adverse developments with respect to the Sale Assets.

8.8.4  Any event, occurrence or fact that causes any of the representations or warranties contained in Article 7 to be untrue at any time in any material respect; provided, that no disclosure by Seller pursuant to this section shall be deemed to amend or supplement any provision of this Agreement or to prevent or cure any misrepresentation, breach of warranty or breach of covenant.

8.9  Post-Closing Payroll Obligations.  After the Closing Date, if requested by the Seller, Purchaser shall provide reasonable non-monetary assistance in connection with the Seller's payment of payroll and payroll-related obligations that accrued prior to the Closing Date.

## ARTICLE 9

9.1  Conditions Precedent to the Obligations of Purchaser.  The obligation of Purchaser to consummate the transactions contemplated herein is subject to the satisfaction, at or before the Closing, of each of the following conditions (any of which conditions may, subject to Section 4.2, be waived by Purchaser in its sole discretion):

9.1.1  The representations and warranties of Seller contained in this Agreement shall be true and correct in all material respects on and as of the Closing Date with the same force and effect as though made on the Closing Date.  Seller shall have performed and complied in all material respects with all covenants and agreements required by this Agreement to be performed or complied with by Seller on or prior to the Closing Date.  Excluding any objections to the entry of the Sale Order, no action, proceeding or investigation (including, without limitation, actions, proceedings or investigations commenced or threatened by a governmental authority) has been commenced or threatened to prevent, or seek damages as a result of, the execution and delivery of this Agreement or the consummation of any of the transactions contemplated herein (unless such action, proceeding or investigation has been dismissed or otherwise disposed of at least seven (7) days prior to the Closing Date).

9.1.2  .  The Bankruptcy Court shall have entered the Sale Order providing for purchase and sale of the Sale Assets free and clear of all liens, claims and encumbrances pursuant to Section 363 of the Bankruptcy Code and assumption and assignment of the Assumed Lease pursuant to Section 365 of the Bankruptcy Code. The Sale Order shall be in form reasonably satisfactory to Purchaser containing certain findings, including without limitation that (i) Purchaser is a "good faith Purchaser" within the meaning of Section 363(m) of the Bankruptcy Code and is thereby entitled to the protection afforded a good faith, arms'-length Purchaser; (ii) the Purchase Price is fair and reasonable; (iii) this Agreement was negotiated at arms' length; and (iv) the sale of the Sale Assets hereunder was conducted in a "non-collusive manner" within the meaning of Section 363(n) of the Bankruptcy Code, and such Sale Order shall not be subject to a stay.

9.1.3  Purchaser shall have received all documents and other items to be delivered by Seller pursuant to Section 5.1.

11

9.1.4 All proceedings, corporate or otherwise, required to be taken by Seller prior to or at Closing in connection with the performance of this Agreement, and all documents incident thereto, shall be complete to the reasonable satisfaction of Purchaser and its counsel.

9.1.5 Between the date of this Agreement and the Closing, there shall have been no Material Adverse Effect (or event that would reasonably be expected to result in a Material Adverse Effect).

9.1.6 No claim, suit, action or other proceeding shall be pending before or by any court, governmental agency, arbitrator or other entity against any of the parties to this Agreement with respect to the transactions contemplated by this Agreement, except for the proceedings conducted in the Bankruptcy Court related to and arising out of the Bankruptcy Petition.

9.1.7 Seller shall on the date of Closing have inventories in an amount not less than $2,900,000 transferable to Purchaser, as determined by the books and records of the Seller, and not less than $2,750,000 transferable to Purchaser, as determined in the reasonable discretion of Purchaser using a cost basis method of valuation; provided, however, if the books and records of the Seller indicate that the valuation of inventory is less than $2,900,000, the Purchaser shall be entitled to reduce the Purchase Price on a dollar for dollar basis in an amount equal to such deficiency, as determined by the books and records of the Seller, but any such reduction shall in no event exceed $100,000. Between the date of this Agreement and the Closing, Purchaser shall have full and complete access to the Sale Assets and the facilities subject to the Assumed Lease and the Distribution Center to view and perform its determination of review of Seller's valuation of inventory.

9.1.8 Purchaser's obligation to purchase the Sale Assets is subject to Seller continuously operating the Seller's business in the Assumed Lease location from the date hereof until the date of Closing, with payment in full of any and all payrolls being satisfied through the date of Closing.

9.1.9 Seller will cause its attorneys to file a Sale Motion for an auction of the Sale Assets, and such auction shall be conducted on or before August 19, 2016.

9.1.10 Subject to Bankruptcy Court approval, Seller shall have filed an amendment to its articles of incorporation changing its name to a name that does not resemble or suggest any relation to "The Southern Season", such name to be reasonably acceptable to Purchaser.

## **ARTICLE 10**

10.1 <u>Conditions Precedent to the Obligations of Seller</u>. The obligation of Seller to consummate the transactions contemplated herein is subject to the satisfaction, at or before the Closing, of each of the following conditions (any of which conditions, subject to Section 4.2, may be waived by Seller in its sole discretion):

10.1.1 The representations and warranties of Purchaser contained in this Agreement shall be true and correct in all material respects on and as of the Closing Date with the same force and effect as though made on the Closing Date. Purchaser shall have performed and complied in all material respects with all covenants and agreements required by this Agreement to be performed or complied with by Purchaser on or before the Closing Date.

10.1.2 The Bankruptcy Court shall have entered the Sale Order providing for purchase and sale of the Sale Assets free and clear of all liens, claims and encumbrances pursuant to Section 363 of the Bankruptcy Code and assumption and assignment of the Assumed Lease pursuant to Section 365 of the Bankruptcy Code. The Sale Order shall be in form reasonably satisfactory to Seller containing certain findings, including without limitation that (i) Purchaser is a "good faith Purchaser" within the meaning of Section 363(m) of the Bankruptcy Code and is thereby entitled to the protection afforded a good faith, arms'-length Purchaser; (ii) the Purchase Price is fair and reasonable; (iii) this Agreement was negotiated at arms' length; and (iv) the sale of the Sale Assets hereunder was conducted in a "non-collusive manner" within the meaning of Section 363(n) of the Bankruptcy Code, and such Sale Order shall not be subject to a stay.

10.1.3 Seller shall have received the Purchase Price and other items to be delivered by Purchaser pursuant to Section 5.2.

10.1.4 All proceedings, corporate or otherwise, required to be taken by Purchaser prior to or at Closing in connection with the performance of this Agreement, and all documents incident thereto, shall be complete to the reasonable satisfaction of Seller and its counsel.

## **ARTICLE 11**

11.1 <u>Termination of Agreement</u>. This Agreement may be terminated only as follows:

11.1.1 By written agreement of Seller and Purchaser at any time.

11.1.2 By Seller or Purchaser, if the Closing shall not have occurred on or prior to August 22, 2016, for any reason other than such party's breach of this Agreement.

11.1.3 By Purchaser, on written notice to Seller, if one or more of the conditions specified in Article 9 is not satisfied on or prior to the Closing Date or if satisfaction of such conditions is or becomes impossible.

11.1.4 By Seller, on written notice to Purchaser, if one or more of the conditions specified in Article 10 is not satisfied on or prior to the Closing Date or if satisfaction of such conditions is or becomes impossible.

11.2 <u>Effect of Termination</u>. If this Agreement is terminated pursuant to this Article 11 and the transactions contemplated hereby are not consummated, this Agreement shall become

null and void and have no further force or effect, and no liability shall attach to either of the parties. Notwithstanding the preceding sentence or anything else in this Agreement to the contrary, the provisions of Sections 3.2 (with respect to the Deposit), this Section 11.2 and Article 12 shall survive any termination of this Agreement.

## ARTICLE 12

12.1 <u>Survival</u>. The parties hereto agree that the representations and warranties contained in this Agreement shall not survive the Closing hereunder, and neither of the parties nor any of its respective officers, directors, representatives, employees, advisors or agents shall have any liability to the other after the Closing for any breach thereof. The parties hereto agree that only the covenants contained in this Agreement that are expressly required to be performed at or after the Closing Date shall survive the Closing hereunder, and each of the parties hereto shall be liable to the other after the Closing Date for any breach thereof.

12.2 <u>Jurisdiction</u>. The parties agree that the Bankruptcy Court shall retain the exclusive and sole jurisdiction to resolve any controversy or claim arising out of or relating to this Agreement or the implementation or the breach hereof. The parties consent to the core jurisdiction of the Bankruptcy Court, to the constitutional authority of the Bankruptcy Court to enter a final judgment, and agree to have waived any right to a jury trial in connection with any disputes related to or arising out of this Agreement.

12.3 <u>Notices</u>. All notices, consents or other communications required or permitted hereunder shall be given in writing and hand delivered or addressed and sent by Federal Express or other recognized overnight courier, or by certified or registered mail, postage prepaid, and return receipt requested, as follows or to such other address as may hereafter be designated by any party by the giving of notices in accordance with this Section 12.3:

12.3.1 Seller: Southern Season, Inc., 100 Europa Drive, Suite 101, Chapel Hill, NC 27517 Attn: John Fioretti, CRO, 17142 Harcombe Drive, Charlotte, NC 28277, Tel: 908-963-3188, Email: jfioretti@abtv.com;

12.3.2 With a copy to: Northen Blue, LLP, 1414 Raleigh Road, Suite 435, Chapel Hill, NC 27517, Attn: John Paul H. Cournoyer, Tel: 919-968-4441, Fax: 919-942-6603, Email: jpc@nbfirm.com;

12.3.3 Purchaser: Calvert Retail, LP, 100 W. Rockland Rd., Suite A, P.O. Box 302, Montchanin Mills, Montchanin, DE 19710, Attn: Eric Brinsfield, Tel: (302) 622-8811, Fax: [-], Email: eric@calvertretail.com;

12.3.4 With a copy to Purchaser Counsel: Saul Ewing LLP 1201 N. Market Street, Suite 2300 P.O. Box 1266 Wilmington, DE 19899-1266, Attn: Teresa K.D. Currier Telephone: 302-421-6826; Email tcurrier@saul.com;

12.3.5 All notices, consents or other communications shall be deemed given when actually delivered (in the case of hand delivery by Federal Express or other recognized overnight courier) or five days after mailing in accordance with this Section 12.3.

12.4 <u>Governing Law</u>.   To the extent not governed by the Bankruptcy Code, this Agreement shall be governed by and construed in accordance with the laws of the State of North Carolina, without giving effect to rules governing the conflict of laws.

12.5 <u>Waiver</u>.   The waiver by a party of a breach of any covenant, agreement or undertaking contained herein shall be made only by a written waiver in each case.  No waiver of any breach of any covenant, agreement or undertaking contained herein shall operate as a waiver of any prior or subsequent breach of the same covenant, agreement or undertaking or as a waiver of any breach of any other covenant, agreement or undertaking.

12.6 <u>Severability</u>.  If any provision of this Agreement shall be held invalid, illegal or unenforceable, in whole or in part, the validity, legality, and enforceability of the remaining part of such provision, and the validity, legality and enforceability of all other provisions hereof or thereof, shall not be affected thereby.

12.7 <u>Counterparts</u>.   This Agreement may be executed in one or more counterparts (whether manually signed or by facsimile or other electronic means), each such counterpart shall be deemed an original, and all such counterparts shall constitute one and the same agreement.

12.8 <u>Captions; References</u>.  The headings, titles or captions of the Articles and Sections of this Agreement are inserted only to facilitate reference, and they shall not define, limit, extend or describe the scope or intent of this Agreement or any provision hereof, and they shall not constitute a part hereof or affect the meaning or interpretation of this Agreement or any part hereof.

12.9 <u>Amendments</u>.  This Agreement may not be amended, changed, modified, altered or terminated unless the parties hereto agree in writing to such amendment, change, modification, alteration or termination.

12.10 <u>Remedies Cumulative; Specific Performance</u>.   Except as otherwise expressly provided in this Agreement, no remedy herein conferred is exclusive of any other available remedy (except for the liquidated damages provision set forth in section 3.2.1.2), but each and every such remedy shall be cumulative and shall be in addition to every other remedy given by agreement or now or hereafter existing at law or in equity or by statute.  Except as otherwise expressly provided in this Agreement, in addition to any and all other remedies that may be available at law, in the event of any breach of this Agreement each party shall be entitled to seek specific performance of the agreements and obligations hereunder and to such other injunctive or equitable relief as may be granted by a court of competent jurisdiction.

12.11 <u>Binding Nature; Assignment</u>.  This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and permitted assigns, but neither this Agreement nor any of the rights, interest or obligations hereunder shall be assigned by any of the parties hereto without prior written consent of the other party.  Nothing contained herein, express or implied, is intended to confer on any Person other than the parties hereto or their successors and assigns, any rights, remedies, obligations or liabilities under or by reason of this Agreement.

12.12 <u>No Third Party Beneficiaries</u>.   This Agreement is a contract solely between Purchaser and Seller.  No third party beneficiaries, (including, without limitation, employees and customers of Seller) are intended hereunder and none shall be inferred herein; and no party other than Purchaser or Seller may assert any right, make any claim or otherwise attempt to enforce any provision of or under this Agreement.

12.13 <u>Bankruptcy Court Approval</u>.   This Agreement shall not be binding on the Purchaser or Seller until it has been approved by entry of the Sale Order by the Bankruptcy Court.

[signatures on following page]

IN WITNESS WHEREOF, the parties have caused their duly authorized officers to execute this Agreement as of the day and year first above written.

PURCHASER:

CALVERT RETAIL, LP

By:    Calvert Retail, Inc.
Its:    General Partner

By:
Name: Eric Brinsfield

SELLER:

SOUTHERN SEASON, INC.

By:
Name: John Fioretti
Title:   CRO

IN WITNESS WHEREOF, the parties have caused their duly authorized officers to execute this Agreement as of the day and year first above written.

PURCHASER:

CALVERT RETAIL, LP

        By:    Calvert Retail, Inc.
        Its:    General Partner

By: _____
Name: Eric Brinsfield

SELLER:

SOUTHERN SEASON, INC.

By:
Name: John Fioretti
Title:  CRO

17

EXHIBIT A
Solicitation of Bids for: Southern Season

See                                                                        attached.

EXHIBIT A
TO
ASSET PURCHASE AGREEMENT



# THREE TWENTY-ONE
## — CAPITAL PARTNERS —

## Solicitation of Bids for:

# SOUTHERN SEASON



# Overview
## Southern Season

Southern Season filed for Chapter 11 Bankruptcy on 6/24/16 and currently has a Chief Restructuring Officer in place.

Southern Season is facing severe cash constraints and all parties in interest are in support of an expedited 363 Sale.

Three Twenty-One Capital Partners has been retained to secure a Stalking Horse bid for the entirety of the company or certain select assets.



# The Opportunity
## Assets Available

Bidders may bid on one, several or all of the pieces of the Southern Season Business:

➢ Flagship retail store and restaurant in Chapel Hill, NC

➢ Three "Taste of Southern Season" small format stores & accompanying inventory

➢ eCommerce online store

➢ Machinery & Equipment Assets remaining from closure of two large format stores

➢ FF&E remaining from closure of two large format stores



# Valuation
## Flagship Store – Chapel Hill

The flagship store in Chapel Hill, NC (retail store + restaurant) can be operated on a stand-alone basis, allowing the buyer to strip out unnecessary overhead from corporate and the distribution center.

The store will need some corporate functions, listed as Overhead Expenses in the accompanying schedule. Bidders should use their own discretion when determining the inclusion/exclusion of these expenses.

Chapel Hill's standalone, 2015 reconstructed EBITDA is $717k. Due to gross margin currently trending higher and a sharp decrease in operating expenses from drastic reductions in headcount and cuts to store/restaurant hours, the projected 12-month, go-forward EBITDA is $2.3mm.

|  | Chapel Hill | |
|---|---|---|
|  | 2015 Actual | Aug '16 - Jul '17 Expected |
| Net Sales | 15,957,825 | 16,021,000 |
| COGS | 8,605,950 | 8,213,000 |
| **Gross Profit** | 7,351,875 | 7,808,000 |
| Gross Margin % | 46.1% | 48.7% |
| Total Operating Expenses | 7,026,483 | 5,624,000 |
| Net Income | 341,642 | 2,184,000 |
|  |  |  |
| **Overhead Expenses** |  |  |
| Controller / Book Keeper | 75,000 | 75,000 |
| HR | 55,000 | 55,000 |
| IT | 50,000 | 50,000 |
| Marketing | 45,000 | 45,000 |
| Workers Comp | 46,349 | 46,349 |
| Total Corporate Expenses | 271,349 | 271,349 |
|  |  |  |
| **EBITDA** |  |  |
| Interest | - | - |
| Provision For Tax - State | - | - |
| Provision For Tax - Federal | - | - |
| Depreciation | 646,706 | 392,000 |
| Amortization | - | - |
| EBITDA | 716,998 | 2,304,651 |



# Valuation
## eCommerce

eCommerce has been a weak-point for the Southern Season business and re-tooling the online store presents a simple sales growth opportunity.

The eCommerce piece of Southern Season is difficult to separate from the Chapel Hill store for the following reasons:

- ○ Common Inventory of Items and Baskets
- ○ Common Labor to build the baskets
- ○ Catalog and or e-commerce site as a marketing vehicle

A bidder of the Chapel Hill Store will most likely include the eCommerce business in the list of assets purchased/bid.

| eCommerce | | |
| --- | --- | --- |
| | 2015 Actual | Aug '16 - Jul '17 Expected |
| Revenue | | |
| Net Sales | 1,833,003 | 2,053,000 |
| Cost of Goods Sold | | |
| COGS | 780,497 | 869,000 |
| Gross Profit | 1,052,506 | 1,184,000 |
| Gross Margin % | 57.4% | 57.7% |
| Expenses | | |
| Total Operating Expenses | 1,142,174 | 1,059,000 |
| Net Income | (89,668) | 125,000 |
| | | |
| EBITDA | | |
| Int., Tax, Depr. & Amort. | - | - |
| EBITDA | (89,668) | 125,000 |



# Valuation
## Taste of Southern Season Stores

| | Raleigh Taste | Asheville Taste | Charleston Taste |
|---|---|---|---|
| | Aug '16 - Jul '17 Expected | | |
| **Revenue** | | | |
| Net Sales | 1,035,000 | 725,000 | 725,000 |
| **Cost of Goods Sold** | | | |
| COGS | 561,000 | 371,000 | 393,000 |
| **Gross Profit** | 474,000 | 354,000 | 332,000 |
| Gross Margin % | 45.8% | 48.8% | 45.8% |
| **Expenses** | | | |
| Total Operating Expenses | 369,000 | 261,000 | 393,000 |
| Net Income | 105,000 | 93,000 | (61,000) |
| | | | |
| **EBITDA** | | | |
| Int., Tax, Depr. & Amort. | 18,000 | 10,000 | 10,000 |
| EBITDA | 123,000 | 103,000 | (51,000) |

Taste of Southern Season is a small format store, which offers the best-selling items from the Southern Season's collection.

Each location can be treated as a stand-alone store or as complimentary to the flagship in Chapel Hill. Because the "Taste" stores have not been open for a full year, performance history is minimal.

The infrastructure and personnel required to support the Chapel Hill store is sufficient to support the Taste store(s), with little-to-no additional overhead cost.

# Valuation
## Fixed Assets



| | Asheville Taste | Charleston Taste | Raleigh Taste | Chapel Hill Rest. | Chapel Hill Retail | Charleston Rest.* | Charleston Retail* | Richmond Rest.* | Richmond Retail* | Corporate | Distribution Center | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Automobile | - | - | - | - | - | - | 21,600 | - | 23,674 | - | 24,256 | 69,530 |
| Cap. Lease | - | - | - | 145,481 | 784,046 | - | - | - | - | - | - | 929,528 |
| Smallwares | - | - | - | 20,282 | 12,266 | 60,147 | 97,632 | 155,180 | 43,134 | - | - | 388,641 |
| Computer Software | 2,994 | 9,212 | 3,950 | 4,504 | 357,573 | 35,449 | 86,889 | 15,416 | 29,486 | 133,154 | 9,345 | 687,972 |
| Machinery & Equipment | 5,213 | 11,403 | 32,634 | 41,024 | 858,785 | 1,054,797 | 264,003 | 25,945 | 232,059 | 34,976 | 147,364 | 2,708,201 |
| Furniture & Fixtures | 20,005 | 8,887 | 20,587 | 103,861 | 1,161,644 | 182,592 | 556,181 | 128,470 | 723,436 | 148,285 | 53,917 | 3,107,865 |
| Leasehold Improvements | 13,103 | 2,525 | 201,567 | 531,786 | 683,451 | 4,089,617 | - | - | - | - | - | 5,522,049 |
| **Total** | 41,314 | 32,027 | 258,737 | 846,938 | 3,857,765 | 1,332,985 | 5,115,922 | 325,011 | 1,051,789 | 316,414 | 234,883 | 13,413,785 |

Bidders interested in assets at locations other than Chapel Hill can bid these assets.

*Charleston & Richmond's full-sized stores were closed. The majority of assets have been moved to the distribution center. The kitchen equipment remains at the Charleston restaurant.

- Cap. Lease: Leased equipment, such as certain kitchen equipment, security cameras, TVs, office equipment, etc.
- Smallwares: Restaurant dishes, flatware, glasses, etc.
- Machinery & Equipment: Forklifts, laser printers, networking equipment, stoves, refrigerators and more.
- Furniture & Fixtures: Desks, chairs, tables, lamps, etc.

Full asset listing available in the data room or upon request.



# Valuation
## Inventory

| | Chapel Hill | Mt. Pleasant* | Charleston | Asheville | Raleigh | Distribution Center | TOTAL |
|---|---|---|---|---|---|---|---|
| Candy | $ 64,156 | $ 16,246 | $ 12,620 | $ 9,602 | $ 11,459 | $ 58,947 | $ 173,029 |
| House & Home | $ 601,121 | $ 75,350 | $ 16,598 | $ 5,363 | $ 16,387 | $ 362,228 | $1,077,046 |
| Coffee & Tea | $ 56,092 | $ 8,734 | $ 3,386 | $ 2,253 | $ 5,156 | $ 33,652 | $ 109,273 |
| Specialty Grocery | $ 210,912 | $ 18,725 | $ 30,431 | $ 26,555 | $ 61,998 | $ 181,906 | $ 530,527 |
| Wine & Beer | $ 561,615 | $ 23,587 | $ - | $ - | $ 21,010 | $ 351 | $ 606,562 |
| Bakery | $ 4,439 | $ 4,485 | $ 1,014 | $ 661 | $ 261 | $ 1,158 | $ 12,019 |
| Cheese | $ 21,944 | $ 2,964 | $ - | $ 83 | $ 1,291 | $ 1,867 | $ 28,150 |
| PF & Takeout | $ 16,712 | $ 9,027 | $ - | $ 214 | $ 42 | $ 3,097 | $ 29,092 |
| Gift, Floral & Supplies | $ 82,685 | $ 22,487 | $ 2,470 | $ 4,167 | $ 43,181 | $ 347,576 | $ 502,565 |
| Restaurant | $ 50,000 | $ - | $ - | $ - | $ - | $ - | $ 50,000 |
| Other | $ 9,711 | $ 7,734 | $ - | $ 25 | $ 684 | $ 6,435 | $ 24,590 |
| | $1,679,385 | $ 189,339 | $ 66,518 | $ 48,923 | $ 161,470 | $ 997,217 | $3,142,852 |

Southern Season has a wide range of inventory on-hand across the various stores and distribution center.

*The Mt. Pleasant store was recently closed, with the majority of inventory now residing in the Chapel Hill store.

Above figures are an inventory snapshot as of end of July.



# Due Diligence Process

## Process of Bidding

➤ Site Visits and/or Management Calls are available by appointment. Please contact:

Devin Hudgins:  443-325-5290 Ext 205 or devin@321capital.com

➤ A Data Room is available to groups that execute and return a signed Confidentiality Agreement



# Solicitation of Bids

## Process of Bidding

➢ Bids due to Three Twenty-One by close of business on Monday Aug. 15th 2016.

➢ Stalking Horse bidder will be given customary bid protection and a break-up fee.

➢ Qualified bids must include a written offer, proof of funds and a good faith deposit held in escrow of $100,000.

Please submit bids to:

erv@321capital.com
erik@321capital.com
devin@321capital.com

EXHIBIT B
Sale Order

See attached.